**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

* * *

| | |
|---|---|
| ESTATE OF FERNANDO SAUCEDA, by and through its Special Administrator, Irene Sauceda; IRENE SAUCEDA, individually and as natural parent and guardian of FERNANDO SAUCEDA, a minor; SEBASTIAN SAUCEDA, a minor; and GIOVANNA SAUCEDA, a minor, | Case No. 2:11-cv-02116-APG-NJK |
| Plaintiffs, | **ORDER** |
| v. | **ORDER GRANTING IN PART DEFENDANTS' AMENDED MOTION FOR SUMMARY JUDGMENT** |
| CITY OF NORTH LAS VEGAS, a corporate city of the State of Nevada; NORTH LAS VEGAS POLICE DEPARTMENT, an entity of the City of North Las Vegas; and OFFICER JEFFREY POLLARD, | (Dkt. #101) |
| Defendants. | |

## I.     BACKGROUND

This case arises out of an officer-involved shooting.  Plaintiffs are the wife and children of the decedent, Fernando Sauceda.  Defendants are the City of North Las Vegas ("North Las Vegas"), the North Las Vegas Police Department ("NLVPD"), and NLVPD special operations officer Jeffrey Pollard.  The incident occurred minutes after midnight on January 1, 2011, at Sauceda's residence in North Las Vegas, Nevada. (Dkt.# 59 at 6.)

Some North Las Vegas residents celebrate New Year's Eve by shooting firearms into the air at midnight. (Dkt.# 58 at 20.)  Shooting within city limits is a misdemeanor crime. (*Id*. at 45.)  Due to the increased number of gunfire incidents on New Year's Eve, the NLVPD required its special operations officers to be on duty. (*Id*. at 16.)  Pollard began his shift that night by attending an operational briefing where he was informed that the special operations team's "mission" was to assist patrol officers and respond to calls involving gunfire and suspects with weapons. (*Id*. at 18-19.)

Pollard and special operations officer Michael Harris teamed up to patrol in Harris's unmarked pickup truck. (Dkt. #59 at 6.)  Both officers wore the NLVPD special operations uniform consisting of an olive green fatigue-style shirt with subdued-colored NLVPD insignia patches on each arm, olive green fatigue-style pants, and a duty belt. (Dkt.# 60 at 21-23; Dkt.# 104-4 at 12.)  Following the incident, the officers were photographed wearing green tactical vests over their uniforms that read "POLICE" in white lettering on the front and back. (Dkt.# 60 at 21-22; Dkt. #104-4 at 12.)

While on patrol, the officers heard gunfire in the neighborhood near Glendale Avenue. (Dkt. #59 at 6.)  As they drove down Glendale Avenue, the officers saw several people standing in the driveway of a residence. (*Id.*)  The officers turned off Glendale and drove around the block. (*Id.*)  As they passed Glendale Avenue again, they saw the group of people still standing in the driveway, one of whom the officers believed had a rifle. (*Id.*)  After they passed the street, they heard more gunfire. (*Id.*)  Pollard and Harris stopped on a nearby street several houses away from the residence where they saw the group of people and exited the pickup truck. (Dkt.# 58 at 37-38, 47-48.)  After hearing more gunshots,[1] Harris notified dispatch that they were responding to gunfire. (*Id.* at 41-42.)  Pollard and Harris un-holstered their handguns and proceeded on foot towards the residence. (*Id.* at 52, 56, 58.)  In the initial approach to the residence, the officers neither verbally announced their presence nor activated their handgun-mounted flashlights. (*Id.* at 56-57.)

When Pollard and Harris were one house away from the residence on the sidewalk, someone standing in the driveway noticed them and asked who they were. (*Id.* at 57.)  According to Pollard and Harris, they activated their handgun-mounted flashlights in response and yelled "police" along with verbal commands. (*Id.* at 57; Dkt. #59 at 6.)  Other witnesses testified that Pollard and Harris shined their flashlights but did not yell "police" or verbal commands. (*See* Dkt.# 80 at 96; Dkt.# 84 at 37-40; Dkt.# 85 at 35-38.)  Witnesses also stated they could not tell who was there because it was dark and they did not recognize Pollard and Harris as police

_____

[1] Crime scene investigators recovered approximately 115 spent shell casings. (Dkt.# 64 at 9.)

officers. (Dkt.# 80 at 115-18; Dkt.# 83 at 48; Dkt.# 84 at 37; Dkt.# 104-1 at 5-7.)  At least two people in the yard ran towards the residence because they did not know who was approaching on the sidewalk. (Dkt.# 84 at 39-40.)  Pollard pursued them to contain the scene, while Harris proceeded towards other people standing in the driveway. (Dkt.# 58 at 64-67.)  At some point between when the officers were standing on the sidewalk and when they entered the yard, Sauceda's wife heard Sauceda say: "Who the fuck is that?" (Dkt.# 79 at 81.)  Another witness heard Sauceda say: "Who is that?  Watch out, watch out.  He's got a gun." (Dkt.# 85 at 45.)

The residence had a porch that was enclosed with a tarp, except for an opening that allowed for ingress and egress through the front door. (Dkt.# 79 at 76.)  Chasing the runners, Pollard reached the porch and saw several people attempting to enter the house. (Dkt.# 58 at 68.)  According to Pollard, while he was giving them verbal commands, he saw movement coming from his left side and so he turned that way. (*Id*. at 69-70.)  Sauceda was only a foot or two away and pointed a gun at Pollard's face. (*Id*. at 70-71.)  Pollard grabbed Sauceda's right arm and fired 12 shots at Sauceda. (*Id*. at 72.)  Despite being hit nine times (five in the front and four in the back), Sauceda ran away. (*Id*. at 73-74.)  Harris heard the gunshots, but he could not see Pollard. (Dkt.# 59 at 6.)  Harris then saw Sauceda approaching him with a gun in his hand. (*Id.* at 7.)  Harris told Sauceda to drop the gun and Sauceda dropped it. (*Id.*)  Harris then yelled at Sauceda to get on the ground and Sauceda fell face down on the ground. (*Id*. at 7; Dkt.# 58 at 73-74.)  Pollard arrived at Harris's location moments later. (Dkt.# 59 at 7.)  After Harris asked him if he was "ok," Pollard said: "That guy put his fucking gun in my face!" (*Id.*)  Backup arrived shortly thereafter. (*Id.*)  Sauceda died at the scene from multiple gunshot wounds. (*Id.*; Dkt.# 72 at 2.)

Plaintiffs filed their lawsuit alleging six causes of action arising from Sauceda's death. Defendants have moved for summary judgment asserting, among other things, that Pollard is entitled to qualified and discretionary immunity and that plaintiffs do not have sufficient admissible evidence to maintain their claims. (Dkt. #101.)

3

1    **II.     LEGAL STANDARD**

2          The Federal Rules of Civil Procedure provide for summary adjudication when the

3    pleadings, depositions, answers to interrogatories, and admissions on file, together with the

4    affidavits, if any, show that "there is no genuine dispute as to any material fact and the movant is

5    entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Material facts are those that may

6    affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).   A

7    dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to

8    return a verdict for the nonmoving party. *See id.*   "Summary judgment is inappropriate if

9    reasonable jurors, drawing all inferences in favor of the nonmoving party, could return a verdict

10   in the nonmoving party's favor." *Diaz v. Eagle Produce Ltd. P'ship*, 521 F.3d 1201, 1207 (9th

11   Cir. 2008) (citing *United States v. Shumway*, 199 F.3d 1093, 1103–04 (9th Cir. 1999)).   A

12   principal purpose of summary judgment is "to isolate and dispose of factually unsupported

13   claims." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).

14         In determining summary judgment, courts apply a burden-shifting analysis.  When the

15   nonmoving party bears the burden of proving the claim or defense, the moving party can meet its

16   burden in two ways: (1) by presenting evidence to negate an essential element of the nonmoving

17   party's case; or (2) by demonstrating that the nonmoving party failed to make a showing

18   sufficient to establish an element essential to that party's case on which that party will bear the

19   burden of proof at trial. *See id.*  If the moving party fails to meet its initial burden, summary

20   judgment must be denied and the court need not consider the nonmoving party's evidence. *See*

21   *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159–60 (1970).

22         If the moving party satisfies its initial burden, the burden then shifts to the opposing party

23   to establish that a genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith*

24   *Radio Corp.*, 475 U.S. 574, 586 (1986).  To establish the existence of a factual dispute, the

25   opposing party need not establish a material issue of fact conclusively in its favor.  It is sufficient

26   that "the claimed factual dispute be shown to require a jury or judge to resolve the parties'

27   differing versions of the truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809

28

4

1   F.2d 626, 631 (9th Cir. 1987).  In other words, the nonmoving party cannot avoid summary

2   judgment by relying solely on conclusory allegations that are unsupported by factual data. *See*

3   *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989).  Instead, the opposition must go beyond the

4   assertions and allegations of the pleadings and set forth specific facts by producing competent

5   evidence that shows a genuine issue for trial. *See Celotex*, 477 U.S. at 324.

6        At summary judgment, a court's function is not to weigh the evidence and determine the

7   truth but to determine whether there is a genuine issue for trial. *See Anderson*, 477 U.S. at 249.

8   The evidence of the nonmovant is "to be believed, and all justifiable inferences are to be drawn in

9   his favor." *Id*. at 255.  But if the evidence of the nonmoving party is merely colorable or is not

10  significantly probative, summary judgment may be granted. *See id.* at 249–50.

11  **III.     CLAIMS UNDER 42 U.S.C. § 1983**

12       **A.  Violations of Civil Rights: Life and Security of Person (First Cause of Action)**

13       A plaintiff may bring a suit under § 1983 to redress violations of "rights, privileges, or

14  immunities secured by the [United States] Constitution and [federal] laws" that occur under the

15  color of state law. 42 U.S.C. §1983.  "To state a claim under § 1983, a plaintiff must [1] allege

16  the violation of a right secured by the Constitution and laws of the United States, and must [2]

17  show that the alleged deprivation was committed by a person acting under color of state law."

18  *West v. Atkins*, 487 U.S. 42, 48 (1988).

19       Plaintiffs' first cause of action alleges that defendants deprived plaintiffs of their right to

20  due process under the Fourth and Fourteenth Amendments, the right to equal protection of the

21  laws under the Fourteenth Amendment, and the rights to be free from excessive force and pre-

22  conviction punishment under the Fourth, Fifth, and Fourteenth Amendments.  Although the claim

23  purports to allege due process and excessive force violations under the Fifth and Fourteenth

24  Amendments, claims alleging that law enforcement used excessive force in the course of a seizure

25  are analyzed under the Fourth Amendment. *Graham v. Conner*, 490 U.S. 386, 395 (1989).

26       Plaintiffs' second claim in their first cause of action alleges deprivation of the right to

27  equal protection under the laws.  "To establish a § 1983 equal protection violation, the plaintiffs

28

must show that the defendants, acting under color of state law, discriminated against them as members of an identifiable class and that the discrimination was intentional." *Flores v. Morgan Hill Unified Sch. Dist.*, 324 F.3d 1130, 1134 (9th Cir. 2003). Defendants moved for summary judgment on this claim, but plaintiffs did not address it in their opposition, thereby conceding the claim. LR 7-2(d). Nevertheless, defendants have met their burden on summary judgment. There is no evidence of intentional discriminatory conduct, and therefore this claim must fail. As a result, the only remaining allegation in count one is that of excessive force in violation of the Fourth Amendment. There are two possible grounds for plaintiffs' excessive force claim: (1) that Pollard used excessive force at the moment of the shooting, and (2) that Pollard provoked the shooting.

### 1. Pollard Did Not Use Excessive Force at the Moment of the Shooting.

Courts analyze allegations of police excessive force under a Fourth Amendment reasonableness test. *Graham*, 490 U.S. at 396; *Smith v. City of Hemet*, 394 F.3d 689, 700 (9th Cir. 2005). "[T]he 'reasonableness' inquiry in an excessive force case is an objective one: The question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them." *Smith*, 394 F.3d at 701 (quoting *Graham*, 490 U.S. at 397). Deadly force may be used when "it is necessary to prevent [the suspect's] escape and the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." *Tennessee v. Garner*, 471 U.S. 1, 3 (1985).

The determination of whether the use of force by an officer is objectively reasonable requires a careful balancing of the "nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396 (quoting *Garner*, 471 U.S. at 8). This involves a three-step analysis. *Glenn v. Washington Cnty.*, 673 F.3d 864, 871 (9th Cir. 2011). First, I evaluate the severity of the intrusion on the individual's Fourth Amendment rights by assessing the "type and amount of force inflicted." *Id.* (internal quotation omitted). "Even if some force is justified, the amount actually used may be excessive." *Id.* (quoting *Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002)).

1   Second, I evaluate the government's interests by assessing: (1) the severity of the crime; (2)

2   whether the suspect posed an immediate threat to the officer's safety; and (3) whether the suspect

3   was resisting arrest or attempting escape. *Id.* at 872 (citing *Graham*, 490 U.S. at 396).  I also may

4   consider other factors relevant to the particular circumstances, such as the availability of less

5   intrusive alternativeness. *Id.* (citing *Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010)).

6   Lastly, I "balance the gravity of the intrusion on the individual against the government's need for

7   the intrusion." *Id.* at 871 (quoting *Miller v. Clark Cnty.*, 340 F.3d 959, 964 (9th Cir. 2003)).

8           This reasonableness inquiry looks at all the relevant objective facts and circumstances that

9   confronted the officer in each particular case, "judged from the perspective of a reasonable officer

10  on the scene, rather than with the 20/20 vision of hindsight." *Drummond ex rel. Drummond v.*

11  *City of Anaheim*, 343 F.3d 1052, 1058 (9th Cir. 2003) (quoting *Graham*, 490 U.S. at 396-97).

12  The reasonableness analysis must also consider the "fact that police officers are often forced to

13  make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving –

14  about the amount of force that is necessary in a particular situation." *Id.* (quoting *Graham*, 490

15  U.S. at 396-97).

16          Because the reasonableness balancing test "nearly always requires a jury to sift through

17  disputed factual contentions, and to draw inferences therefrom," courts should grant summary

18  judgment in excessive force cases "sparingly." *Glenn*, 673 F.3d at 871 (quoting *Smith*, 394 F.3d

19  at 701).  "This is because police misconduct cases almost always turn on a jury's credibility

20  determinations." *Drummond*, 343 F.3d at 1056.  However, a court may decide reasonableness as a

21  matter of law if, "in resolving all factual disputes in favor of the plaintiff, the officer's force was

22  objectively reasonable under the circumstances." *Jackson v. City of Bremerton*, 268 F.3d 646, 651

23  n.1 (9th Cir. 2001) (internal quotation omitted).

24          Here, Pollard used deadly force, the intrusiveness of which is "unmatched." *Garner*, 471

25  U.S. at 9.  As to the governmental interests at stake, the crime being investigated (celebratory

26  gunfire) was a misdemeanor, but it represented both a public hazard and a danger to the officers

27  because of the presence of weapons.  Moreover, Sauceda posed an immediate threat when he

28

7

1  pointed a gun at Pollard at close range. "When an individual points his gun in the officers'

2  direction, the Constitution undoubtedly entitles the officer to respond with deadly force." *George*

3  *v. Morris*, 736 F.3d 829, 838 (9th Cir. 2013) (citing *Long v. City & Cnty. Of Honolulu*, 511 F.3d

4  901, 906 (9th Cir. 2007)). Balancing the gravity of the intrusion with the governmental interests

5  involved, Pollard was justified in using deadly force at the moment when he fired his weapon

6  because he faced an imminent threat of death or severe injury from Sauceda.

7                    *2.  Genuine Issues of Fact Remain Regarding Provocation.*

8         Even if Pollard's use of deadly force was reasonable at the moment of the shooting, he

9  may still be liable under a provocation theory. "Officers may be held liable for an otherwise

10 lawful defensive use of deadly force when they intentionally or recklessly provoke a violent

11 confrontation by actions that rise to the level of an independent Fourth Amendment violation."

12 *Sheehan v. City & Cnty. of S.F.*, 743 F.3d 1211, 1216 (9th Cir.) cert. granted sub nom. *City &*

13 *Cnty. of S.F., Cal. v. Sheehan*, 135 S. Ct. 702 (2014); *see also Billington v. Smith*, 292 F.3d 1177,

14 1189 (9th Cir. 2002). Thus, to establish liability for the shooting under a provocation theory,

15 plaintiffs must show (1) Pollard's conduct leading up to the confrontation recklessly or

16 intentionally provoked the confrontation, and (2) Pollard's reckless or intentional conduct

17 constituted an independent Fourth Amendment violation. *Burns v. City of Redwood City*, 737 F.

18 Supp. 2d 1047, 1062 (N.D. Cal. 2010); *see also Espinosa v. City & Cnty. of S.F.*, 598 F.3d 528,

19 538-39 (9th Cir. 2010).

20        For example, in *Espinosa v. City & County of San Francisco*, evidence showed that

21 officers improperly entered the plaintiff's home and drew their weapons, resulting in a deadly

22 shootout. 598 F.3d at 538-39. The Ninth Circuit affirmed the district court's denial of summary

23 judgment because there were genuine disputes about whether the officers' reckless entry and

24 threat of force that provoked the deadly shootout violated the Fourth Amendment. *Id; see also*

25 *Sheehan*, 743 F.3d at 1216 (denying summary judgment because the plaintiff "presented a triable

26 issue as to whether the officers committed an independent Fourth Amendment violation by

27 unreasonably forcing their way back into her home, and . . . also presented evidence from which a

28

                                                      8

1   reasonable jury could find that the officers acted recklessly in doing so"); *Burns*, 737 F. Supp. 2d

2   at 1062 (holding plaintiff raised triable issues of fact as to whether the pepper spray and take-

3   down of plaintiff by police were constitutionally excessive given the degree of threat he presented

4   and whether such a violation "provoked" plaintiff's resistance).

5       There is no evidence Pollard intentionally provoked the confrontation with Sauceda.  But

6   viewing all reasonable disputes of fact in plaintiffs' favor, there is a triable issue as to whether

7   Pollard's warrantless entry onto the covered porch, with his gun drawn, was reckless.  The

8   officers were responding to misdemeanor celebratory gunfire, and Pollard admits that when he

9   approached Sauceda's home he did not see any weapons and he did not otherwise feel threatened.

10  (Dkt. #58 at 64.)  In the dark, Pollard's fatigue-style uniform did not readily identify him as a

11  police officer, and the officers were driving an unmarked pickup truck.  Viewing witness

12  testimony in plaintiffs' favor, Pollard drew his weapon, chased after people, entered Sauceda's

13  covered porch without a warrant and without announcing himself as a police officer, and pointed

14  his weapon at people.  A reasonable jury could find Pollard acted recklessly.

15      As to whether this conduct constituted an independent constitutional violation, the parties

16  do not adequately address this question. *See Espinosa*, 598 F.3d at 537 ("[P]ointing a loaded gun

17  at a suspect, [and] employing the threat of deadly force, is [nevertheless] use of a high level of

18  force."); *Robinson v. Solano Cnty.*, 278 F.3d 1007, 1014 (9th Cir. 2002) (en banc) (holding the

19  plaintiff established a Fourth Amendment excessive force violation where officers pointed a gun

20  at him when they were investigating a misdemeanor, he was unarmed and peaceful, there were no

21  dangerous or exigent circumstances, and the officers outnumbered him); *Mendez v. Cnty. of Los

22  Angele*s, No. CV 11-04771-MWF PJWX, 2013 WL 4202240, at *31 (C.D. Cal. Aug. 13, 2013).

23  Plaintiffs refer to Pollard's actions in approaching the house with his gun drawn even though

24  Pollard did not feel threatened, but they do not adequately brief whether Pollard's actions

25  constitute an independent Fourth Amendment violation.  Although defendants argue in reply that

26  Pollard had probable cause or reasonable suspicion "to confront the shooters and take steps to

27  stop the shooting," defendants likewise do not adequately brief whether Pollard's specific conduct

28

1   constituted an independent constitutional violation that provoked the deadly confrontation. (Dkt.

2   #105 at 10.)  Because neither party has adequately briefed whether this conduct violates one or

3   more constitutional rights, I will direct the parties to submit supplemental briefs on this issue.

4        Additionally, although *Billington* clearly established the provocation doctrine long before

5   this incident, because the parties have not adequately briefed whether Pollard's conduct

6   constituted an independent constitutional violation that provoked the confrontation, they also

7   have not adequately briefed whether any rights violations were clearly established at the time of

8   the incident. *See Pearson v. Callahan*, 555 U.S. 223, 232 (2009); *Mendez*, 2013 WL 4202240, at

9   *31 (denying summary judgment on qualified immunity in provocation doctrine case because the

10  underlying, predicate constitutional violations were clearly established).  Plaintiffs point to

11  *Garner* for the proposition that at the time of the incident, it was clearly established that an officer

12  could not use deadly force to prevent the escape of a felony suspect where the suspect "poses no

13  immediate threat to the officer and no threat to others." *Garner*, 471 U.S. at 11; (Dkt. #104 at 18.)

14  However, the case before me does not involve deadly force on a fleeing felon.  While *Garner*

15  informs the inquiry, it does not sufficiently address the facts of this case.  Defendants likewise do

16  not address whether, viewing the facts in the light most favorable to plaintiffs, Pollard's conduct

17  in drawing his weapon and chasing after potential misdemeanants onto a tarp-covered porch and

18  then aiming his weapon at them without announcing he is a police officer violates clearly

19  established rights.  I therefore will direct the parties to also brief the issue of whether, viewing the

20  facts in the light most favorable to plaintiffs, it was clearly established at the time of the incident

21  that Pollard committed an independent Fourth Amendment violation that provoked the deadly

22  confrontation with Sauceda.[2]

23

24  _____

25  [2] *See Stanton v. Sims*, 134 S.Ct. 3, 7 (2013) (holding officer was entitled to qualified immunity
    because law regarding warrantless entry into a yard while in hot pursuit of a misdemeanant was
    not clearly established but expressing no opinion on whether the officer violated the constitution);
26  *United States v. Struckman*, 603 F.3d 731, 738 (9th Cir. 2010) (discussing what constitutes
    constitutionally protected curtilage to the home); *Tekle v. United States*, 511 F.3d 839, 845-47
27  (9th Cir. 2007) (discussing when aiming a loaded weapon may constitute excessive force);
    *Hopkins v. Bonvicino*, 573 F.3d 752, 769 (9th Cir. 2009) (stating that exigencies related to a
28  misdemeanor offense "rarely, if ever," will justify warrantless entry into a home); *Robinson*, 278
    F.3d at 1013-15 (same); *United States v. Johnson*, 256 F.3d 895, 908 n.6 (9th Cir. 2001) (en banc)

1

**B.  Violation of Civil Rights: Municipal Liability (Second Cause of Action)**

2        Count two of the complaint asserts 42 U.S.C. § 1983 claims against Defendants

3   NLVPD and North Las Vegas.  Plaintiffs raise three theories of liability: (1) a policy, practice,

4   and custom of ratifying unconstitutional conduct, (2) a policy, practice, and custom of negligent

5   training and supervision, and (3) that a final policy maker expressly ratified defendants'

6   unconstitutional conduct.

7        A municipal entity may be liable under § 1983 "only where the municipality itself causes

8   the constitutional violation through execution of a government's policy or custom, whether made

9   by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy."

10   *Ulrich v. City & Cnty. of S.F.*, 308 F.3d 968, 984 (9th Cir. 2002) (quotation omitted).  A policy is

11   a "deliberate choice to follow a course of action . . . made from among various alternatives by the

12   official or officials responsible for establishing final policy with respect to the subject matter in

13   question." *Fairley v. Luman*, 281 F.3d 913, 918 (9th Cir. 2002) (quotation omitted).  A policy can

14   be one of action or inaction. *Id*.  A municipality may be liable for its inaction when the

15   municipality's "deliberate indifference led to its omission" and "the omission caused [a

16   municipal] employee to commit the constitutional violation." *Gibson v. Cnty. of Washoe, Nev.*,

17   290 F.3d 1175, 1186 (9th Cir. 2002) (citing *City of Canton v. Harris*, 489 U.S. 378, 387-89

18   (1989)).  To establish liability through omission, a plaintiff must demonstrate: (1) that a

19   municipal employee violated plaintiff's rights; (2) that the municipality has customs or policies

20   that amount to deliberate indifference; and (3) that these policies were the moving force behind

21   the employee's violation of plaintiff's constitutional rights. *Id*. at 1194.  "To prove deliberate

22   indifference, the plaintiff must show that the municipality was on actual or constructive notice

23   that its omission would likely result in a constitutional violation." *Id*. at 1186.  A policy, or lack

24

25

26   _____

27   (stating that "where an officer is truly in hot pursuit and the underlying offense is a felony, the
     Fourth Amendment usually yields . . . [but] in situations where the underlying offense is only a
28   misdemeanor, law enforcement must yield to the Fourth Amendment in all but the 'rarest' cases."
     (quoting *Welsh v. Wisconsin*, 466 U.S. 740, 753 (1984)).

1    thereof, is a "moving force" if the municipality "could have prevented the violation with an

2    appropriate policy." *Id*. at 1194.

3          The failure to train or supervise police officers may serve as a basis for liability when the

4    failure amounts to deliberate indifference to the rights of persons with whom the police come into

5    contact. *Long v. Cnty. of L.A.*, 442 F.3d 1178, 1186 (9th Cir. 2006); *Davis v. City of Ellensburg*,

6    869 F.2d 1230, 1235 (9th Cir. 1989) (holding inadequate training and supervision claims should

7    be analyzed under the same standard).  A plaintiff must show the supervision or training is

8    inadequate and the inadequate supervision or training represents municipal policy. *Id*.  There must

9    also exist actual causation between the inadequate supervision or training and the deprivation of

10   the plaintiff's rights. *Merritt v. Cnty. of L.A.*, 875 F.2d 765, 770 (9th Cir. 1989).  Municipal

11   policymakers' "continued adherence . . . to an approach that they know or should know has failed

12   to prevent tortious conduct by employees may establish the conscious disregard for the

13   consequence of their action – the deliberate indifference – necessary to trigger municipal

14   liability." *Long*, 442 F.3d at 1186 (quotation omitted).  However, evidence the municipality failed

15   to train one officer is insufficient to establish a municipality's deliberate policy. *Blankenhorn v.*

16   *City of Orange*, 485 F.3d 463, 484-85 (9th Cir. 2007).  Rather, the inadequate training must be

17   widespread. *Id*.

18         Finally, a municipality "can be liable for an isolated constitutional violation if the final

19   policymaker 'ratified' a subordinate's actions." *Christie v. Ipoa*, 176 F.3d 1231, 1238 (9th Cir.

20   1999).  To establish ratification, the plaintiff must prove a final policymaker knew of the alleged

21   violation and approved of his subordinate's decision and the basis for it. *Id*. at 1239.  Ratification

22   generally requires more than the final policymaker's "acquiescence" of an employee's conduct.

23   *Sheehan*, 743 F.3d at 1231 (holding a city's failure to discipline officers for alleged

24   unconstitutional conduct did not amount to ratification).

25         Here, plaintiffs have failed to present sufficient evidence to raise a genuine issue of

26   material fact that North Las Vegas or the NLVPD failed to train or supervise police officers such

27   that a policy or custom of using excessive force developed.  The record is void of evidence

28

describing Pollard's training.  Additionally, plaintiffs base their theory of inadequate training on an expert report that does not purport to review the qualifications of the NLVPD's training program. (Dkt.# 104-4.)  Plaintiffs' expert instead opines that Pollard's actions were unreasonable and correlates Pollard's conduct from this single incident with a "pattern and practice" of improper training in the NLVPD as a whole.[3] (*Id*. at 13.)  A review of the officers' conduct from this single incident is insufficient to establish the existence of an inadequate training program representing a municipal custom or policy of excessive force.

Furthermore, plaintiffs' reliance on the fact that Pollard's supervisors found no issues with his conduct in this particular situation is inadequate to show that either North Las Vegas or the NLVPD has widespread policies or customs that amount to deliberate indifference.  Plaintiffs' expert opines that the NLVPD supervisors mismanaged the incident by not intervening sooner. (Dkt.# 104-4 at 13.)  The report correlates Pollard's conduct and the supervisors' response to this incident with a "serious lack of the proper training required and supervision for officers within the North Las Vegas Police Department." (*Id*. at 13.)  However, a review of the supervisors' conduct from a single incident is likewise insufficient to show a policy or custom of widespread inadequate supervision.  Plaintiffs have failed to produce any record of prior improper police conduct that went unsupervised or undisciplined by NVLPD officials, or that Pollard had any prior misconduct that went ignored or was improperly disciplined. *See Gillette v. Delmore*, 979 F.2d 1342, 1349 (9th Cir. 1992) ("A section 1983 plaintiff may attempt to prove the existence of a custom or informal policy with evidence of repeated constitutional violations for which the errant municipal officials were not discharged or reprimanded.").

Finally, Plaintiffs have not identified who they contend is a final policymaker.  Even assuming that NLVPD Chief Chronister could be considered a final policymaker, his statement that Pollard "acted correctly" is insufficient to raise a genuine issue of fact that he "made a deliberate choice to endorse" Pollard's conduct because there is little evidence Chronister was

---

[3] In contrast, defendants' expert reviewed NLVPD's training materials and concluded that they constitute acceptable practices recognized throughout the United States. (Dkt.# 77 at 8.)

1    aware of the relevant facts. *Id.*; (Dkt.# 104-6 at 6.)  Chronister stated that to his "recollection" he

2    was "not aware of anything that [Pollard] did incorrectly." (*Id.*)  This is not sufficient to establish

3    Chronister "expressly endorsed" or "adopted" Pollard's conduct.  Accordingly, I will grant

4    defendants' motion as to plaintiffs' municipal liability claim.

5    **IV.    STATE LAW CLAIMS**

6         Plaintiffs assert various state law tort claims in counts three, four, five, and six of the

7    complaint.  Defendants argue that Pollard is entitled to discretionary immunity as to those

8    claims.[4]  Defendants further argue that there is insufficient evidence in the record to support these

9    claims.

10        **A. Discretionary Immunity**

11        In Nevada, no action may be brought against a state officer or employee or any state

12   agency or political subdivision that is "[b]ased upon the exercise or performance or the failure to

13   exercise or perform a discretionary function or duty on the part of the State or any of its agencies

14   or political subdivisions or of any officer . . . whether or not the discretion involved is abused."

15   Nev. Rev. Stat. § 41.032.

16        To determine whether a state officer is entitled to discretionary immunity, the Nevada

17   Supreme Court applies a two-part test.  A decision is entitled to discretionary immunity under

18   section 41.032 if the decision "(1) involves[s] an element of individual judgment or choice and

19   (2) [is] based on considerations of social, economic, or political policy." *Martinez v. Maruszczak*,

20   168 P.3d 720, 728-29 (Nev. 2007).  In analyzing discretionary immunity, courts "must assess

21   cases on their facts, keeping in mind Congress' purpose in enacting the exception: to prevent

22   judicial second-guessing of legislative and administrative decisions grounded in social, economic,

23   and political policy through the medium of an action in tort." *Id*. at 729 (citation omitted).

24

25

26   ─────────────────────

27   [4] In their motion, defendants argue that "Officer Pollard" is entitled to discretionary immunity on
     the state law claims of assault and battery, intentional and/or negligent infliction of emotional
     distress, and negligence.  In their reply, however, defendants argue that "defendants" are entitled

28   to discretionary immunity on all of the state law claims.  I will not grant summary judgment
     based on arguments raised for the first time on reply.

"Police officers 'exercise discretion and are thus generally immune from suit where the act at issue required personal deliberation, decision, and judgment, rather than obedience to orders, or the performance of duty in which the officer is left no choice of his own.'" *Sandoval v. Las Vegas Metro. Police Dep't*, 756 F.3d 1154, 1168 (9th Cir. 2014) (quoting *Davis v. City of Las Vegas*, 478 F.3d 1048, 1059 (9th Cir. 2007)).  Here, Pollard meets the first prong of the test because his decision to investigate the gunfire, as well as his decisions on how to proceed in the investigation and the subsequent use of force, required personal deliberation and judgment.

Pollard's conduct, however, does not meet the second prong of the test.  Immunity attaches under the second prong "if the injury-producing conduct is an integral part of governmental policy-making or planning, if the imposition of liability might jeopardize the quality of governmental process, or if the legislative or executive branch's power or responsibility would be usurped." *Martinez*, 168 P.3d at 729.  Because no branch of the government has the legitimate power to violate the United States Constitution, "acts which violate the Constitution are not discretionary." *Goodman v. Las Vegas Metro. Police Dep't*, 963 F. Supp. 2d 1036, 1061 (D. Nev. 2013) (quoting *Jarvis v. City of Mesquite Police Dep't*, No. 09-CV-0851, 2012 WL 600804, at *5 (D. Nev. Feb. 23, 2012)); *see also Nurse v. U.S.*, 226 F.3d 996, 1002 (9th Cir. 2000) ("In general, governmental conduct cannot be discretionary if it violates a legal mandate."). Moreover, an officer's "decisions regarding the amount of force to use are not the kind of policy decisions" discretionary immunity shields because they do not involve an integral part of governmental policy-making or jeopardize the quality of the governmental process. *Vasquez-Brenes v. Las Vegas Metro. Police Dep't*, No. 2:12-CV-1635, 2014 WL 4471542, at *11 (D. Nev. Sept. 10, 2014); *Huff v. North Las Vegas Police Dep't*, No. 2:10-CV-01394, 2013 WL 6839421, at *10 (D. Nev. Dec. 23, 2013).  Consequently, because genuine issues of material fact remain regarding whether Pollard violated Sauceda's Fourth Amendment right to be free from excessive force, Pollard's conduct does not fall within Nev. Rev. Stat. § 41.032.  He therefore is not entitled to discretionary immunity.

**B.  Intentional and/or Negligent[5] Infliction of Emotional Distress (Third Cause of Action)**

To state a claim for intentional infliction of emotional distress, a plaintiff must show: (1) the defendant's conduct was extreme, outrageous, and committed with either the intention of, or reckless disregard for, causing emotional distress; (2) the plaintiff suffered severe or extreme emotional distress; and (3) causation. *Olivero v. Lowe*, 995 P.2d 1023, 1025 (Nev. 2000). "Extreme and outrageous conduct is that which is outside all possible bounds of decency and is regarded as utterly intolerable in a civilized community." *Maduike v. Agency Rent-A-Car*, 953 P.2d 24, 26 (Nev. 1998).  To establish severe emotional distress, the plaintiff must demonstrate that "the stress [is] so severe and of such intensity that no reasonable person could be expected to endure it." *Alam v. Reno Hilton Corp.*, 819 F. Supp. 905, 911 (D. Nev. 1993).

Defendants argue there is no evidence they engaged in extreme or outrageous conduct and there is no evidence defendants acted with the requisite intent.  Plaintiffs did not respond to these arguments, and they therefore consent to the motion being granted.  Local Rule 7-2(d).  However, I am required to examine the motion on its merits. *Heinemann v. Satterberg*, 731 F.3d 914, 916 - 917 (9th Cir. 2013) (holding that a local rule that permits the court to deem a non-movant's failure to respond a complete abandonment of its opposition to summary judgment conflicts with Fed. R. Civ. P. 56 and thus cannot provide a valid basis for granting a motion for summary judgment). Defendants argue "Officer Pollard acted to protect himself and his partner from the deadly threat presented by Fernando Sauceda who not only refused to put down his gun, but actually pointed it directly at Officer Pollard." (Dkt. #101 at 26.)  Defendants contend that in such circumstances, the officers did not act outrageously or with the requisite intent to cause emotional distress. However, defendants' argument does not take the facts in the light most favorable to plaintiffs as I must on summary judgment.  As discussed above, plaintiffs' version of the events raise several questions, including whether the officers identified themselves as police, whether Pollard provoked the circumstances by chasing people onto the covered porch with his gun drawn, and

---

[5] Defendants do not move for summary judgment on plaintiffs' negligent infliction of emotional distress claim.  This claim therefore remains pending.

1    whether Pollard violated clearly-established rights.  Because the parties' supplemental briefs on

2    the excessive force issues may inform the resolution of this portion of the motion for summary

3    judgment, I will withhold my decision at this time.

4        **C.  Assault and Battery (Fourth Cause of Action)**

5            To state an assault claim, a plaintiff must demonstrate that the defendant: (1) intended to

6    cause harmful or offensive physical contact and (2) the victim was put in apprehension of such

7    contact. *Sandoval v. Las Vegas Metro Police Dep't*, 854 F. Supp. 2d 860, 882 (D. Nev. 2012)

8    (citing Restatement (Second) of Torts, § 21 (1965)), *reversed on other grounds by* Sandoval v.

9    Las Vegas Metro. Police Dep't, 756 F.3d 1154 (9th Cir. 2014).  To state a battery claim, a

10   plaintiff must demonstrate that the defendant: (1) intended to cause harmful or offensive contact

11   and (2) such contact occurred. *Burn*, 175 F. Supp. 2d at 1269 (citing Restatement (Second) of

12   Torts §§ 13, 18 (1965)).

13           In Nevada, police officers are privileged to use the amount of force reasonably necessary.

14   *See Yada v. Simpson*, 913 P.2d 1261, 1262 (Nev. 1996), *superseded by statute on other grounds*

15   *as recognized by RTTC Commc'n, LLC v. Saratoga Flier, Inc.*, 110 P.3d 24, 29 (Nev. 2005).

16   Officers are "liable for battery to the extent they use more force than is reasonably necessary."

17   *Ramirez v. City of Reno*, 925 F. Supp. 681, 691 (D. Nev. 1996) (applying Nevada law); *see Yada*,

18   913 P.2d at 1262.  The standard for assault and battery under Nevada law is, therefore, the same

19   as a § 1983 claim. *Id.*; *Vasquez-Brenes*, 2014 WL 4471542, at *11.  Because genuine issues

20   remain regarding whether Pollard used reasonable force, I will withhold deciding defendants'

21   motion on the assault and battery claim until after the parties' supplemental briefs.

22       **D.  Negligence (Fifth Cause of Action)**

23           To state a negligence claim, a plaintiff must show: (1) the defendant owed a duty of care

24   to the plaintiff; (2) the defendant breached that duty; (3) the breach was the legal cause of the

25   plaintiff's injury; and (4) the plaintiff suffered damages. *Scialabba v. Brandise Constr. Co., Inc.*,

26   921 P.2d 928, 930 (Nev. 1996) (citation omitted).  "Whether a defendant owes a plaintiff a duty

27   of care is a question of law." *Id.*  Police officers owe a duty of care to members of the general

28

1  public with whom they come into contact. *Vasquez-Brenes*, 2014 WL 4471542, at \*12.  Because

2  genuine issues remain regarding whether Pollard used reasonable force, I will withhold from

3  deciding defendants' motion on the negligence claim until after the parties' supplemental briefs.

4      **E.  Negligent Supervision and Training (Sixth Cause of Action)**

5         An employer has a duty to use "reasonable care in the training, supervision, and

6  retention of his or her employees to make sure that the employees are fit for their positions." *Hall*

7  *v. SSF, Inc.*, 930 P.2d 94, 99 (Nev. 1996).  To state a claim for negligent training and supervision,

8  a plaintiff must show: "(1) a general duty on the employer to use reasonable care in the training

9  and/or supervision of employees to ensure that they are fit for their positions; (2) breach; (3)

10  injury; and (4) causation." *Okeke v. Biomat USA, Inc*., 927 F. Supp. 2d 1021, 1028 (D. Nev.

11  2013).  "Claims for negligent training and supervision are based upon the premise that an

12  employer should be liable when it places an employee, who it knows or should have known

13  behaves wrongfully, in a position in which the employee can harm someone else." *Id*.  "Nevada

14  law does not permit the inference that an employer was negligent in training or supervising

15  simply because the Defendant's employees acted in a discriminatory manner; the fact that an

16  employee acts wrongfully does not in and of itself give rise to a claim for negligent hiring,

17  training, or supervision." *Romero v. Nev. Dep't of Corr.*, No. 2:08-CV-808, 2013 WL 6206705, at

18  \*17 (D. Nev. Nov. 27, 2013) (quotation omitted).

19         Here, plaintiffs have failed to present sufficient evidence to support a claim of negligent

20  supervision or training.  Plaintiffs have not offered any evidence of Pollard's training.  Further,

21  that plaintiffs' expert believes Pollard's supervisors should have intervened before the officers

22  contacted the individuals in the driveway is insufficient to establish negligent supervision. (Dkt.#

23  104-4 at 13.)  There is no evidence that Pollard had previously been disciplined for using

24  excessive force or that the NLVPD was otherwise on notice that Pollard was prone to act in an

25  unconstitutional manner in performing his duties as a police officer.  I therefore grant defendants'

26  motion as to the negligent supervision and training claim.

27

28

1    **V.   PUNITIVE DAMAGES**

2         Local governments are immune from punitive damages under 42 U.S.C. § 1983. *City of*

3    *Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 259-60 (1981); *Bryan v. Las Vegas Metro. Police*

4    *Dep't*, 349 Fed. Appx. 132, 134-35 (9th Cir. 2009) (agreeing that *City of Newport* barred punitive

5    damages against the municipality and the police department).  Because both North Las Vegas and

6    the NLVPD are immune from punitive damages on plaintiffs' federal claims, I grant defendants'

7    motion regarding punitive damages on the § 1983 claims against North Las Vegas and NLVPD.

8         Moreover, "[a]n award for damages in an action sounding in tort brought under NRS

9    § 41.031 or against a present or former officer or employee of the State or any political

10   subdivision . . . may not include any amount as exemplary or punitive damages." Nev. Rev. Stat.

11   § 41.035(1); *see also Clements v. Airport Auth. of Washoe Cnty.*, 69 F.3d 321, 336-37 (9th Cir.

12   1995).  Because § 41.035(1) bars a punitive damages award as to all defendants, I will grant

13   defendants' motion on the state law tort claims seeking punitive damages.

14        However, punitive damages may be awarded under 42 U.S.C. § 1983 against a

15   governmental employee acting in an individual capacity if the plaintiff proves the employee's

16   conduct is malicious, oppressive, or in reckless disregard of the constitutional rights of others.

17   *Dang v. Cross*, 422 F.3d 800, 807 (9th Cir. 2005) (internal quotation marks omitted).  Because

18   there are genuine issues surrounding the reasonableness of Pollard's conduct, the availability of

19   punitive damages may be informed by the parties' supplemental briefs.  Therefore, I will

20   withhold deciding this issue until after the supplemental briefs are filed.

21   **VI.  CONCLUSION**

22        In accord with the foregoing, I hereby ORDER:

23
24       1.  Defendants' Amended Motion for Summary Judgment (Dkt. #101) is GRANTED
             IN PART.  Judgment in Defendants' favor is GRANTED on the Second Cause of
25           Action (municipal liability), and the Sixth Cause of Action (negligent supervision
             and training).

26       2.  Summary judgment is GRANTED in favor of defendants as to all claims for
27           punitive damages against the City of North Las Vegas and the North Las Vegas
             Police Department.  Summary judgment is GRANTED in favor of defendants as to
28           punitive damages on the state law claims against Officer Pollard.

19

3.  I withhold my decision on the remaining arguments in the motion for summary judgment until after the parties file their supplemental briefs on the questions posed below.

4.  The parties shall file supplemental briefs within fourteen days from the date of entry of this order on the following issues ONLY:

    a.  Whether, viewing the facts in the light most favorable to plaintiffs, Officer Pollard's conduct constituted independent constitutional violations that provoked the deadly confrontation, and

    b.  Whether, viewing the facts in the light most favorable to plaintiffs, any such violations were clearly established at the time of the incident.

DATED THIS 2nd day of March, 2015.


_____
ANDREW P. GORDON
UNITED STATES DISTRICT JUDGE