# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

ESTATE OF FERNANDO SAUCEDA, *et al.*,  )
)
Plaintiffs,  )          Case No.: 2:11-cv-02116-GMN-NJK
vs.  )
)          **ORDER**
CITY OF NORTH LAS VEGAS, *et al.*,  )
)
Defendants.  )
_____)

Pending before the Court is the Renewed Motion for Summary Judgment, (ECF No.
140), filed by the City of North Las Vegas ("North Las Vegas"), the North Las Vegas Police
Department ("NLVPD"), and Officer Jeffrey Pollard ("Pollard") (collectively "Defendants").
Plaintiffs the Estate of Fernando Sauceda, Irene Sauceda, and their minor children (collectively
"Plaintiffs") filed a Response, (ECF No. 141), and Defendants filed a Reply, (ECF No. 146).

For the reasons discussed herein, Defendants' Renewed Motion for Summary Judgment
is **GRANTED in part** and **DENIED in part**.

## I.   BACKGROUND

### A.  Factual Summary

This case arises from an officer-involved shooting at the home of Plaintiffs in North Las
Vegas soon after midnight on January 1, 2011.  On the night of the incident, Plaintiffs and
several other individuals were at Plaintiffs' home celebrating New Year's Eve. (*See* Order
1:15– 2:19, ECF No. 107).  Special Operations Officers Jeffrey Pollard and Michael Harris[1]
were tasked that evening with patrolling the neighborhood near Plaintiff's home and
particularly, to be on the lookout for celebratory gunfire, a common occurrence in North Las

_____

[1] Harris is a not a party to this action.

Vegas on New Year's Eve. (*Id.* 2:1–2); (Pollard Dep. 16:21–17:1, 20:6–14, Ex. A to Defs.' Mot. Summ. J. ("MSJ"), ECF No. 140-2). The officers were patrolling in Harris's unmarked pickup truck with Pollard in the passenger seat. (Order 2:1–2, ECF No. 107); (Pollard Dep. 38:11–13). The officers were wearing the NLVPD special operations uniform, consisting of an olive green, fatigue-style shirt with subdued-colored NLVPD insignia patches on each arm, and a duty belt. (*Id.* 2:2–5).

At approximately midnight, the officers drove past Plaintiffs' house when Pollard saw a group of people standing in front of the home with the lights on. (Pollard Dep. 34:12–25, 35:19–23). Pollard testified he did not see anything suggesting illegal activity. (*Id.* 36:3–18). Pollard and Harris continued down the street, circled the block, and from an adjacent street, three houses away, Pollard glanced at Plaintiffs' home and observed "somebody holding something shiny up in the air that looked like maybe the barrel of a rifle." (*Id.* 36:22–37:5–16). At this point, the officers did not hear any gunshots. (*Id.* 37:17–18).

After Pollard described to Harris what he saw, the officers parked the truck a few properties away from Plaintiffs' house. (*Id.* 48:4–20). The officers notified dispatch, and waiting outside the truck for thirty seconds to a minute to devise a plan. (*Id.* 40:23–25). Standing outside the truck, Pollard and Harris heard the sounds of gunshots in the distance, and subsequently notified dispatch, obtaining a "code red," by which a police radio channel is cleared. (*Id.* 42:9–21). According to Pollard, the officers "weren't sure that [Plaintiffs' home was] where the gunfire came from. We weren't sure. We only heard shots in the air. We were hearing numerous shots coming from different aspects of the city." (*See id.* 45:25–46:18) (responding to question asking why Pollard thought he saw a rifle yet declined to wait for backup).

After devising their plan to make their approach, the officers exited the truck several houses down from Plaintiffs' residence, unholstered their guns, and walked toward Plaintiffs'

home at normal pace without activating their handgun-mounted flashlights or announcing their presence. (Order 2:15–19, ECF No. 107). The officers heard no further gunshots once they commenced their approach. (Pollard Dep. 49:15–20).

As the officers arrived within two houses of Plaintiffs, an unidentified individual standing in Plaintiffs' driveway noticed Pollard and Harris and asked who they were. (*Id.* 2:20–21); (Pollard Dep. 56:21–57:6). The officers activated their flashlights and rushed onto the property. (Order 2:21–22). The officers claim that they announced themselves as police, but the other witnesses testified that the officers did not identify themselves and that in their camouflage uniforms, they did not recognize the officers as law enforcement. (*Id.* 2:21–26).

While Harris approached several individuals standing in the driveway, Pollard pursued other individuals who had run toward the residence. (*Id.* 3:1–7). The residence included a porch that is enclosed with a tarp, except for an opening that allowed for ingress and egress through the front door. (*Id.* 3:8–9). Chasing the runners, Pollard ran up to the porch and pulled back the tarp, looking in. (*Id.* 3:9–10). Pollard noticed movement to his left and turned to find Fernando Sauceda ("Sauceda") pointing a gun at his face. (*Id.* 3:11–13). Officer Pollard held down Sauceda's right arm and, after a struggle, fired twelves shots at Sauceda as he attempted to flee. (*Id.* 3:12–14); (Pollard Dep. 71:19–74:2). Officer Pollard's shots hit Sauceda nine times—five in the front and four in the back—and he died shortly thereafter. (Order 3:14–21).

## B. Procedural History

On December 30, 2011, Plaintiffs filed the instant suit alleging six causes of action arising from the shooting: (1) violations of the Fourth Amendment under 42 U.S.C. § 1983; (2) section 1983 municipal liability; (3) intentional or negligent infliction of emotional stress; (4) assault and battery; (5) negligence; and (6) negligent supervision and training. (*See* Compl. ¶¶ 25–47, ECF No. 1).

On February 12, 2014, Defendants moved for summary judgment on all of Plaintiffs' claims, (ECF No. 101). In his order, Judge Gordon found in favor of Defendants on the municipal liability and negligent supervision claims, as well as Plaintiffs' prayer for punitive damages emanating from municipal liability and state-law tort liability.[2] (Order 11:1–14:4, 18:4–26, 19:1–13, ECF No. 107). Judge Gordon withheld judgment on Plaintiffs' Fourth Amendment excessive force claim, the three other state law claims, and Plaintiffs' prayer for punitive damages against Pollard pursuant to § 1983. (*Id.* 19:14–20:8). As to excessive force, Judge Gordon concluded that the actual shooting of Sauceda itself was not excessive force. (*Id.* 6:7–8:6). However, Judge Gordon ordered supplemental briefing on whether Pollard's alleged conduct in provoking the shooting independently violated the Constitution such that the Fourth Amendment claim, as well as three state law claims, would survive summary judgment. (*Id.* 8:7–10:22, 16:1–18:3, 19:21–20:8).

Following entry of the order, Plaintiffs filed a motion to reconsider, (ECF No. 112), and both parties filed their respective supplemental briefs. (*See* ECF Nos. 113, 114). Upon Judge Gordon's recusal, this matter was reassigned to this Court, (*See* ECF No. 115). On December 1, 2015, the Court denied Plaintiffs' motion to reconsider and Defendants' motion for summary judgment. (*See* Order 17:11–18:2, ECF No. 121). Applying the Ninth Circuit's provocation rule, the Court concluded Pollard may be liable for excessive force because of a disputed issue of material fact "concerning whether Officer Pollard's actions leading up to the shooting constituted a constitutional violation." (*Id.* 8:19–21). The Court found that Defendants failed to establish entitlement to the exigency or emergency exception to the Fourth Amendment's warrant requirement, and that Pollard is not entitled to qualified immunity. (*Id.* 10:10–11, 17:7–10). Finally, the Court denied Defendants' motion for summary judgment as to Plaintiffs' state

---

[2] The parties do not raise any challenges to Judge Gordon's order on these claims.

law claims given the Court's holding as to the provocation rule. (*Id.* 8:19–22, 17:14–18:2). Pollard subsequently appealed the Court's judgment to the Ninth Circuit. (*See* ECF Nos. 123, 125–126).

During the pendency of Pollard's appeal, the United States Supreme Court issued its decision in *County of Los Angeles v. Mendez*, 137 S. Ct. 1539 (2017), in which the Court abrogated the Ninth Circuit's provocation rule, stating the "Fourth Amendment provides no basis for such a rule." *Id.* at 1544, 1546–48.

Because this Court's summary judgment orders were premised, in part, upon application of the provocation rule, the Ninth Circuit vacated those orders and remanded the case "so that the court can consider the summary judgment issues in light of [*Mendez*]." (*See* ECF No. 134). This Court subsequently ordered the parties to "refile their summary judgment briefing specifically discussing the impact of [*Mendez*]." (ECF No. 137).

## II. <u>LEGAL STANDARD</u>

The Federal Rules of Civil Procedure provide for summary adjudication when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those that may affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *See id.* "Summary judgment is inappropriate if reasonable jurors, drawing all inferences in favor of the nonmoving party, could return a verdict in the nonmoving party's favor." *Diaz v. Eagle Produce Ltd. P'ship*, 521 F.3d 1201, 1207 (9th Cir. 2008) (citing *United States v. Shumway*, 199 F.3d 1093, 1103–04 (9th Cir. 1999)). A principal purpose of summary judgment is "to isolate and dispose of factually unsupported claims." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).

In determining summary judgment, a court applies a burden-shifting analysis. "When the party moving for summary judgment would bear the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial. In such a case, the moving party has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case." *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (citations omitted). In contrast, when the nonmoving party bears the burden of proving the claim or defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *See Celotex Corp.*, 477 U.S. at 323–24. If the moving party fails to meet its initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159–60 (1970).

If the moving party satisfies its initial burden, the burden then shifts to the opposing party to establish that a genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). To establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 631 (9th Cir. 1987). In other words, the nonmoving party cannot avoid summary judgment by relying solely on conclusory allegations that are unsupported by factual data. *See Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). Instead, the opposition must go beyond the assertions and allegations of the pleadings and set forth specific facts by producing competent evidence that shows a genuine issue for trial. *See Celotex Corp.*, 477 U.S. at 324.

At summary judgment, a court's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *See Anderson*, 477 U.S. at 249. The evidence of the nonmovant is "to be believed, and all justifiable inferences are to be drawn in his favor." *Id*. at 255. But if the evidence of the nonmoving party is merely colorable or is not significantly probative, summary judgment may be granted. *See id.* at 249–50.

## III.  DISCUSSION

In the instant Motion, Defendants argue that Pollard is entitled to summary judgment on the merits of Plaintiffs' Fourth Amendment claim or else is protected by qualified immunity. Plaintiffs contend that, notwithstanding *Mendez*, the Court's prior findings and conclusions apply with equal force to the present matter before the Court. Before turning to Defendants' Motion and the parties' arguments, the Court first considers the impact of the Supreme Court's holding in *Mendez*.

### A.  *County of Los Angeles v. Mendez*

In *Mendez*, the United States Supreme Court nullified the Ninth Circuit's "provocation rule," concluding that "the Fourth Amendment provides no basis for such a rule." *Mendez*, 137 S. Ct. at 1544. The Ninth Circuit's provocation rule "permit[ted] an excessive force claim under the Fourth Amendment 'where an officer intentionally or recklessly provokes a violent confrontation, if the provocation is an independent Fourth Amendment violation.'" *Id.* at 1546 (quoting *Billington v. Smith*, 292 F.3d 1177, 1189 (9th Cir. 2002)). Under the rule, once a court determines that a forceful seizure is reasonable under *Graham v. Conner*, 490 U.S. 386 (1989), the court must "ask whether the law enforcement officer violated the Fourth Amendment in some other way in the course of events leading up to the seizure." *Id.* "If so, that separate Fourth Amendment violation may 'render the officer's otherwise *reasonable* defensive use of force *unreasonable* as a matter of law.'" *Id.* (quoting *Billington*, 292 F.3d at 1190–91) (emphasis in original).

Rejecting the provocation rule, the Supreme Court clarified the "settled and exclusive framework" for analyzing Fourth Amendment excessive force claims. *Id.* Specifically, "[d]etermining whether the force used to effect a particular seizure is reasonable requires balancing of the individual's Fourth Amendment interests against the relevant government interests." *Id.* (quoting *Graham*, 490 U.S. at 396). In such cases, the operative question is "whether the totality of the circumstances justifie[s] a particular sort of search or seizure." *Id.* (quoting *Tennessee v. Garner*, 471 U.S. 1, at 8–9 (1985)). "The reasonableness of the use of force is evaluated under an 'objective' inquiry that pays 'careful attention to the facts and circumstances of each particular case,'" and "'must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" *Id.* (quoting *Graham*, 490 U.S. at 396). "Contrary to [the provocation rule], the objective reasonableness analysis must be conducted separately for each search or seizure that is alleged to be unconstitutional." *Id.* at 1547.

The Supreme Court cautioned, however, that a plaintiff could still succeed on a Fourth Amendment claim through a theory of proximate causation. The Court explained: "[P]laintiffs can—subject to qualified immunity—generally recover damages that are proximately caused by any Fourth Amendment violation." *Id.* at 1548 (citing *Heck v. Humphrey*, 512 U.S. 477, 483 (1994) (noting that § 1983 "creates a species of tort liability" informed by tort principles regarding "damages and the prerequisites for their recovery.")). "Proper analysis of this proximate cause question require[s] consideration of the 'foreseeability or the scope of the risk created by the predicate conduct,' and require[s] the court to conclude that there was 'some direct relation between the injury asserted and the injurious conduct alleged.'" *Id.* at 1548–49 (quoting *Paroline v. United States*, 134 S. Ct. 1710, 1719 (2014)).

**B. Excessive Force**

Preliminarily, Pollard is entitled to summary judgment on Plaintiffs' excessive force theory of liability. In light of *Mendez*, whether Pollard's warrantless entry onto Sauceda's porch recklessly provoked the subsequent deadly encounter no longer factors into the excessive force analysis. *See Mendez*, 137 S. Ct. at 1547 ("*The* framework for analyzing excessive force claims is set out in *Graham*. If there is no excessive force claim under *Graham*, there is no excessive force claim at all."). The Court has already concluded that Pollard did not use excessive force under *Graham*, (*see* Order 6:11–8:6, ECF No. 107), and the Court need not repeat that analysis here.[3]

**C. Proximate Cause—Predicate Constitutional Violation**

Although the provocation rule is defunct, *Mendez* does not foreclose a plaintiff from recovering on a distinct Fourth Amendment theory of proximate causation. *See Mendez*, 137 S. Ct. at 1548. To invoke this alternative theory of liability, a plaintiff must establish a predicate Fourth Amendment violation. *Id.*; *see also Mendez v. Cnty. of Los Angeles*, 897 F.3d 1067, 1074 (9th Cir. 2018).

As discussed below, Defendants have failed to carry their burden of establishing that an exception to the warrant requirement justified Pollard's entry onto Plaintiffs' enclosed porch, and Pollard's constitutional violation in this regard violated clearly established law. Consequently, Plaintiffs' proximate cause theory of liability will be treated on the merits.

**1. Warrantless Entry**

Pollard's warrantless entry onto Plaintiffs' porch was in contravention of the Fourth Amendment. "The Fourth Amendment protects '[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.'" *Bonivert v.*

---

[3] The parties do not challenge or otherwise assign error to that holding.

*City of Clarkston*, 883 F.3d 865, 873 (9th Cir. 2018) (quoting U.S. Const. amend. IV). The "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *United States v. Martinez*, 406 F.3d 1160, 1163 (9th Cir. 2005) (quoting *Payton v. New York*, 445 U.S. 573, 585 (1980)). "For that reason, '[i]t is a 'basic principle of Fourth Amendment law' that warrantless searches of the home or the curtilage surrounding the home 'are presumptively unreasonable.'" *Bonivert*, 883 F.3d at 873 (quoting *Payton*, 445 U.S. at 586).

Pollard did not have a warrant upon entering Sauceda's enclosed porch, and Defendants do not dispute that the porch, the home's curtilage, is protected by the Fourth Amendment. Therefore, Pollard's entry was presumptively unreasonable and will constitute a Fourth Amendment violation unless an exception applies.

### 2. Exceptions to the Warrant Requirement

Defendants advance several justifications for Pollard's entry onto Plaintiffs' porch with varying levels of specificity. Defendants argue the following: (a) Pollard needed to pursue Plaintiffs' guests onto the porch because they disobeyed his command; (b) residential gunfire at night supports a reasonable belief that injured victims might be present; and (c) Pollard needed to apprehend the guests he chased based upon fear for his safety, others' safety, and to prevent destruction of evidence or the escape of a suspect. (*See* MSJ 22:1–23:24, ECF No. 140); (Defs.' Suppl. Br. 10:1–10, 19:23–28, ECF No. 155); (Defs.' Suppl. Br. 7:15–8:14, 9:19–11:8, ECF No. 114).

"There are two general exceptions to the warrant requirement for home searches: exigency and emergency." *Martinez*, 406 F.3d at 1164. "The 'emergency' exception stems from the police officers' 'community caretaking function' and allows them 'to respond to emergency situations' that threaten life or limb; this exception does 'not [derive from] police officers' function as criminal investigators.'" *United States v. Struckman*, 603 F.3d 731, 738

(9th Cir. 2010) (citation omitted). The emergency exception applies when "(1) in considering the totality of the circumstances, law enforcement had an objectively reasonable basis for concluding that there was an immediate need to protect others or themselves from serious harm; and (2) the search's scope and manner were reasonable to meet the need." *United States v. Snipe*, 515 F.3d 947, 952 (9th Cir.2008). This exception is "narrow," and its boundaries are "rigorously guarded" to prevent any expansion that would unduly interfere with the sanctity of the home. *Hopkins v. Bonvicino*, 573 F.3d 752, 763 (9th Cir. 2009).

"By contrast, the 'exigency' exception does derive from the police officers' investigatory function; it allows them to enter a home without a warrant if they have both probable cause to believe that a crime has been or is being committed and a reasonable belief that their entry is 'necessary to prevent . . . the destruction of relevant evidence, the escape of the suspect, or some other consequence improperly frustrating legitimate law enforcement efforts.'" *Id.* (quoting *United States v. McConney*, 728 F.2d 1195, 1199 (9th Cir.1984) (en banc)). "The exigent circumstances exception is premised on 'few in number and carefully delineated' circumstances . . . in which 'the exigencies of the situation' make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment.'" *Id.* (quoting *United States v. United States District Court*, 407 U.S. 297, 318 (1972); *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006)). The Ninth Circuit has recognized exigent circumstances in situations involving: "(1) the need to prevent physical harm to the officers or other persons, (2) the need to prevent the imminent destruction of relevant evidence, (3) the hot pursuit of a fleeing suspect; and (4) the need to prevent the escape of a suspect." *Id.*

The burden is on the government to establish an exception to the Fourth Amendment's warrant requirement applies. *Bonivert*, 883 F.3d at 877 ("'[T]he police bear a heavy burden

when attempting to demonstrate an urgent need that might justify warrantless searches or arrests[.]'") (quoting *Welsh v. Wisconsin*, 466 U.S. 740, 740–50 (1984)).

The Court begins with Defendants' hot pursuit argument. (MSJ 26:15–23, ECF No. 114). "The hot pursuit exception to the warrant requirement only applies when officers are in 'immediate' and 'continuous' pursuit of a suspect from the scene of the crime." *United States v. Johnson*, 256 F.3d 895, 907 (9th Cir. 2001) (quoting *Welsh*, 466 U.S. at 753). Defendants state that Pollard chased individuals onto the enclosed porch only after they refused to yield to Pollard and Harris's command, yelling "Police. Show me your hands." (MSJ 22:25–27, ECF No. 140); (Pollard Dep. 68:5–7, ECF No. 140-2). Several witnesses, however, testified in depositions that they did not recognize Harris or Pollard as police officers, nor did the officers announce themselves as such. (Francisco Aguire Dep. 54:2–14, ECF No. 83); (Jose Rodriguez Dep. 34:22–24, 35:6–9, ECF No. 85); (Cassandra Maynor Dep. 27:1–28:22, ECF No. 86); (Irene Sauceda Dep. 96:6–21, ECF No. 80). Because there is a genuine factual dispute as to whether the officers announced themselves, the Court cannot credit the "failure to obey" explanation at summary judgment.

As to Defendants' general contentions concerning residential gunfire and exigency, Defendants have not proffered any objectively reasonable basis for Pollard's belief that storming the enclosed porch was necessary to prevent destruction of evidence, apprehend suspected persons therein, or to safeguard against harm to officers or others. Instead, the facts Defendants rely upon in their Renewed Motion are either unsupported by the record or undisputedly unknown to the officers at the time of their approach of Plaintiffs' house.

For example, Defendants state—without citation to the record—"Pollard concluded the shots were coming from [Sauceda's house]," and as the "Officers parked and approached they heard additional gunshots coming from the house." (MSJ 22:4–9). Pollard expressly testified, when asked why he didn't wait for backup: "We weren't sure that that's where the gunfire

came from. We weren't sure. . . . Because it's dark. We didn't actually see the muzzle flash or anybody shooting there. We only heard shots in the air. We were hearing numerous shots coming from different aspects of the city." (Pollard Dep. 45:25–46:18). Indeed, when Pollard observed "somebody holding something shiny up in the air that looked like maybe the barrel of a rifle," he nevertheless stated he could not identify any illegal activity and characterized the persons he saw as innocuously standing in front of Sauceda's house. (*Id.* 34:12–25, 35:19–23, 36:3–37:16).

Pollard further stated that once the officers left their vehicle and began walking toward Sauceda's house—at normal pace, passing by three houses along the way—the officers heard no further gunfire. (*Id.* 49:15–20). As the officers were in between the second and third house, one of Plaintiffs' unidentified guests asked, "Who goes there?" (*Id.* 56:21–57:6). According to Pollard, at this point he and Harris announced "Police! Show us your hands," and activated their flashlights. The guests ran in different directions, and Pollard chased after one group headed toward the enclosed porch. Pollard testified that prior to the officers' announcement, they did not see any guns, evidence of a crime, or otherwise feel threatened. (*Id.* 64:14–21).

Against this backdrop, the Court previously rejected Defendants' reliance on exigency, holding that in addition to an absence of articulable facts suggesting exigency or emergency, the officers' stealth approach was objectively unreasonable. The Court explained:

> The officers were not in pursuit of a fleeing suspect as they approached the house, and there is nothing indicating that the officers' stealth approach and storming of the residence was justified in order to prevent the destruction of evidence, to protect themselves or others, or to effect some other legitimate law enforcement effort. At the time of their approach, the officers did not see any weapons or hear any gunshots, so they had no reason to believe that a quick rush of the residence was necessary to protect themselves or others. Indeed, it was because of the manner of their search that the officers put their lives and the lives of others in danger by creating a chaotic and panicked situation in an area where they believed firearms to be located. Therefore, a jury could

find that the manner of their search was unreasonable and not justified by exigent circumstances.

(*See* Order 12:24–13:9, ECF No. 121).  Of greater significance here, by resorting to general justifications, Defendants fails to link these justifications to the facts of this case and, specifically, to Pollard's purportedly reasonable belief that entry *onto the porch* was necessary to achieve those ends.

Defendants cite several cases for the proposition that gunshots alone, without any other evidence of criminal activity, is enough for an officer's warrantless search for victims. (*Id.* 8:24–9:18).  The commonality among these cases is that the officers were able to articulate facts leading them to reasonably connect the emergency or exigency with the location to be searched. *See, e.g.*, *United States v. Klump*, 536 F.3d 113, 118 (2d Cir. 2008) (holding that exigent circumstances justified firefighters' entry into a warehouse when the fire chief, upon arrival, "smelled what he described as a 'half electrical, half oily . . . kind of sweet' smell that 'definitely had an odor of something burning.'"); *see also United States v. Schmidt*, 700 F.3d 934, 937–38 (7th Cir. 2012) (concluding that warrantless search of a backyard to check for injured persons was permissible where officers responded to shots fired in the neighborhood and bullet holes and bullet casings were found in areas adjacent to backyard); *United States v. Huffman*, 461 F.3d 777, 781–86 (6th Cir. 2006) (finding that officers responding to reports of gunshots at a residence, who subsequently viewed bullet holes in the structure and received no response after knocking on the door, lawfully entered under the exigent circumstances exception to ensure nobody was injured inside).

Here, by contrast, Pollard acknowledges he saw no evidence of criminal wrongdoing upon his on-foot approach of the residence.  Indeed, these cases illustrate the point that is fatal to Defendants' position—exigency or emergency in the abstract cannot substitute for specific, articulable facts with respect to warrantless entry. *See, e.g.*, *Sandoval v. Las Vegas Metro. Police Dep't*, 756 F.3d 1154, 1164 (9th Cir. 2014) ("[Officer] Dunn's only mention of a threat

was in terms so general that they could apply to any interaction involving suspects in a home. . . . Simply invoking the unknown in these circumstances is not sufficient."); *United States v. Ojeda*, 276 F.3d 486, 488 (9th Cir. 2002) (per curiam) (recognizing that, where officers seek to justify a warrantless entry on the basis of "a risk of danger to the arresting officers or third persons," the "government bears the burden of showing specific and articulable facts to justify" invoking the exception); *United States v. Becker*, 23 F.3d 1537, 1541 (9th Cir. 1994) ("[W]hile peril to officers or the possibility of destruction of evidence or escape may well demonstrate an exigency, mere unspecific fears about [this] possibility will not.").

Based upon the foregoing, the Court finds that Pollard's warrantless entry onto Sauceda's enclosed porch violated the Fourth Amendment, and no exception to the warrant requirement applies. A genuine issue of fact precludes the Court from holding the hot pursuit doctrine justified Pollard's entry. And Defendants' broad arguments concerning exigency and emergency impermissibly rely upon facts favorable to Defendants and, more importantly, conspicuously neglect to address their linkage to the enclosed porch.

Having decided Pollard violated the Fourth Amendment and cannot rely upon any exception, the Court turns to qualified immunity.

### 3. Qualified Immunity

Courts employ a two-step sequence to resolve government officials' qualified immunity defenses. *See Pearson v. Callahan*, 555 U.S. 223, 232 (2009). At step one, the court must decide whether a plaintiff has pleaded sufficient facts to "make out a violation of a constitutional right." *Id.* "Second, if the plaintiff has satisfied this first step, the court must decide whether the right was 'clearly established' at the time of defendant's alleged misconduct." *Id.* (quoting *Saucier v. Katz*, 533 U.S. 194, 199 (2001)).

### a. *Constitutional Violation*

As decided above, Pollard's warrantless entry is justified by neither the exigency nor emergency exception to the warrant requirement. Accordingly, the Court proceeds to step two.

### b. *Clearly Established Right*

"Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (quoting *White v. Pauly*, 137 S. Ct. 548, 551 (2017)). "Because the focus is on whether the officer had fair notice that her conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct." *Id.* (citation omitted). While this analysis does not require a case directly on point for a right to be clearly established, "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).

Neither party disputes that it was clearly established that Sauceda's porch constitutes curtilage and is therefore protected by the Fourth Amendment. Nor is there disagreement that a warrantless entry into a home is unconstitutional absent an exigency or emergency. The question here is whether the factual particularities of this case so cloud these well-established principles that Pollard reasonably, but mistakenly, believed them to be inapplicable. The Court concludes the answer is no.

As discussed above, Defendants advance two general arguments—one specific, and one general—to establish Pollard's reasonable belief that a warrantless entry onto the enclosed porch was justified: (1) gunshots in a residential area support an inference of imminent destruction of evidence, danger to officers, or the need to render emergency aid; and (2) Pollard chased Plaintiffs' guests onto the porch after they refused to obey his command.

With respect to Defendants' general contention that residential gunfire gives rise to a host of purportedly reasonable inferences, the absence of any *specific* proffered factual basis for

Pollard's entry onto the porch suggests to the Court that no reasonable officer could have believed that exigency or emergency justified the warrantless entry. *See Hopkins*, 573 F.3d at 771 ("[W]hen there is a 'complete lack of evidence that would support a reasonable suspicion,' and the officers have provided a 'wholly inadequate justification for the[ir] search, we conclude that it would have been clear to a reasonable officer that [such a search] was unlawful.'") (quoting *Ramirez v. City of Buena Park*, 560 F.3d 1012, 1023 (9th Cir. 2009)). It has long been well established that the presence of an exigency or emergency alone, is insufficient to justify resort to those exceptions. *See, e.g.*, *id.* at 772 ([W]ith respect to the lack of probable cause and the lack of exigent circumstances—the absence of either one of which would preclude the officers' reliance on the exigency exception."). Given the lack of articulable facts linking the officers' suspicions to the porch, the Court is without necessary facts upon which it could conceivably hold that Pollard's mistaken belief was reasonable.[4]

The Court likewise denies Pollard qualified immunity as to hot pursuit. Clearly established law on hot pursuit required an "immediate or continuous" pursuit of a suspect from the "scene of a crime." *Welsh*, 466 at 753. As discussed *supra*, there is a genuine factual dispute as to whether Pollard and Harris announced themselves, and whether Plaintiffs' guests recognized them as law enforcement. Because Pollard chased these persons due to their failure to yield to his commands, Pollard's failure to announce—if credited by a factfinder at trial—would divest him of any legitimate justification for giving chase onto the porch.

---

[4] The lack of any articulable facts with respect to Pollard's interest in the porch distinguishes this case from *Ryburn v. Huff*, 565 U.S. 469 (2012). In *Huff*, officers effected a warrantless entry into the home of a high school student suspected of threatening to shoot up the school. *Id.* at 470. The officers in that case "testified to a number of factors" leading them to be concerned "for their own safety and of other persons," such that their warrantless entry was reasonable. *Id.* at 475–476. One factor, among others, was that immediately prior to entry, the officers asked the student's mother if there were guns in the house, to which she reacted by promptly turning away and running into the house. *Id.* 474–75. Here, in contrast, Pollard has not pointed to similar facts giving rise to his suspicions upon his arrival at Plaintiffs' home.

On this basis, *Stanton v. Sims*, 571 U.S. 3 (2013), upon which Defendants rely, is readily distinguishable. In *Stanton*, the U.S. Supreme Court held a police officer was entitled to qualified immunity after chasing a misdemeanant into an enclosed backyard. *Id.* Police responded to an "unknown disturbance" involving a person with a baseball bat in an area known for violence. *Id.* Officer Stanton arrived at the scene wearing a police uniform and driving a marked car when he noticed three men walking down the street. *Id.* "Upon seeing the police car, two of the men turned into a nearby apartment complex," while one man, Patrick, remained in place. *Id.* Although the officers did not see a baseball bat, they decided to detain Patrick to investigate. *Id.* at 4. One of the officers exited his patrol car, and yelled "Police!" and "ordered Patrick to stop in a voice loud enough for all in the area to hear." *Id.* Patrick looked directly at the officers and fled to an enclosed backyard. *Id.* Officer Stanton, believing Patrick violated California law by disobeying his commands, chased Patrick into the backyard, kicking open a gate, causing serious injury to the homeowner, an innocent bystander. *Id.* at 4–5. The Supreme Court found that the law was not firmly established as to whether hot pursuit of a fleeing suspect is appropriate when the crime is a mere misdemeanor. *Id.* at 6–11. Accordingly, the Court held Officer Stanton was protected by qualified immunity. *Id.*

Here, unlike *Stanton*, it is disputed whether the officers announced their presence and undisputed that the officers arrived not wearing standard police uniforms and driving an unmarked truck. At the time of the incident, January 1, 2011, it was well established that the reasonableness of an officer's reaction to a disobeying suspect necessarily turns on whether the suspect knows it is an officer of the law demanding submission. On this point, the Ninth Circuit's decision in *Bryan* is instructive.

In *Bryan*, the Ninth Circuit reversed the district court's grant of summary judgment on qualified immunity given a factual dispute over whether the officer identified himself. 349 F. App'x 132, 135 (9th Cir. 2009). In that case, a police officer shot the plaintiff following his

refusal to obey the officer's command to drop his weapon. *Id.* In holding the district court erred in granting the officer qualified immunity, the Ninth Circuit stated: "Had [Officer] Rubio failed to identify himself as a police officer before telling [plaintiff] to drop his gun—as [plaintiff] and his mother claim—[plaintiff] would have had no duty to drop his gun (or else be shot) at the insistence of an unidentified intruder." *Id.*

The *Bryan* Court analogized its holding to *Sledd v. Lindsay*, a Seventh Circuit case involving similar facts. In *Sledd*, police officers executed a search warrant at 10:30 p.m. at the plaintiff's home.102 F.3d 282, 285 (7th Cir. 1996). The officers executing the warrant were not wearing full police uniforms and there was a factual dispute as to whether the officers knocked on the door and identified themselves. *Id.* at 286. When the plaintiff heard commotion from the front door of his house, he assumed it was an attempted burglary and grabbed his firearm. *Id.* When the plaintiff made eye contact with an officer who had entered his home, a "'storm of gunfire' broke out from the unidentified man, [the plaintiff] was shot immediately, and he collapsed on the floor." *Id.* "At no time during his brief encounter with the man did anyone shout 'police,' 'freeze, police.'" *Id.* The Seventh Circuit reversed the district court's grant of summary judgment to the officers in light of factual disputes, including whether "the officers announced their presence and warned [the plaintiff] that they were police executing a warrant." *Id.* at 288. The *Sledd* Court based its holding, in part, on a decision from the Sixth Circuit, where the court affirmed the district court's denial of qualified immunity to the officers on similar grounds. *Id.* at 287. *See Yates v. City of Cleveland*, 941 F.2d 444, 447 (6th Cir. 1991) ("An officer who intentionally enters a dark hallway in the entrance of a private residence in the middle of the night, and fails to give any indication of his identity, is more than merely negligent.").

In short, *Bryan*, *Sledd*, and *Yates* align to a greater degree than *Stanton* with the facts of this case. The objective reasonableness of Pollard's pursuit of individuals disobeying his

command is contingent upon a factual dispute that the Court cannot resolve at summary judgment. If a factfinder determines that Pollard's version of the facts is undeserving of credence, then the asserted justification for Pollard's storming of the porch drops out of the picture. Assuming this result will obtain—as the Court must at summary judgment—Pollard's warrantless entry violated Plaintiffs' clearly established rights. The Court, therefore, denies Pollard qualified immunity.

Having determined Pollard is not entitled to qualified immunity for his warrantless entry, the Court now turns to proximate cause.

### 4. Proximate Cause

"Proximate cause analysis requires consideration of the 'foreseeability or the scope of the risk created by the predicate conduct,' and requires the court to conclude that there was 'some direct relation between the injury asserted and the injurious conduct alleged.'" *Mendez*, 137 S.Ct. at 1548–49 (quoting *Paroline*, 134 S.Ct. at 1719). "[P]roximate cause thus serves, *inter alia*, to preclude liability in situations where the causal link between conduct and result is so attenuated that the consequence is more aptly described as mere fortuity." *Paroline*, 134 S.Ct. at 1719 (citation omitted).

Here, there is at least a genuine issue of material fact as to whether Pollard's predicate conduct proximately caused Fernando Sauceda's death. That is, viewing the facts in a light most favorable to Plaintiffs, Sauceda's death was within the scope of risk created by Pollard's warrantless entry.

A recent case out of the Tenth Circuit provides a useful point of departure for the Court's analysis. In *Attocknie v. Smith*, 798 F.3d 1252, 1257 (10th Cir. 2015), officers planned to execute an arrest upon Randall, who had an outstanding year-old bench warrant for drug felonies. *Id.* at 1256. On the day of the planned arrest, one of the officers, Officer Cherry, observed an individual, presumed to be Randall, in the garage of Randall's son Aaron's house.

*Id.* Cherry enlisted backup to meet at a nearby convenience store to plan the arrest. *Id.* Under the officers' plan, "Cherry would lead the other officers to Aaron's house, where some officers would follow Cherry as he went to the front of the house and others would cover the back to prevent Randall's escape." *Id.*

When Cherry and other officers returned to Aaron's house, Cherry "saw somebody who appeared to be Randall running through the garage into the house." *Id.* Cherry "immediately ran to the front door with gun drawn yelling 'police,' pushed the door open, and '[w]ithin two seconds' shot Aaron, who was standing a few feet from the door, allegedly holding a knife." *Id.* Randall was not found on the premises. *Id.* at 1257.

In addition to holding Cherry was not entitled to qualified immunity as to his hot pursuit defense, the Tenth Circuit stated: "[B]ecause a reasonable jury could determine that the unlawful entry was the proximate cause of the fatal shooting of Aaron, we need not decide whether Cherry used excessive force when he confronted Aaron." *Id.* at 1258.

*Attocknie* is illustrative because the facts of the instant case fit even more comfortably with the foreseeability analysis. Unlike *Attocknie*, Pollard and Harris were responding to a situation involving firearms, creating a greater risk of a firefight. Additionally, unlike *Attocknie*, Pollard and Harris were not wearing standard police uniforms and, according to witnesses, failed to announce themselves, leading to an even greater likelihood that Plaintiffs' guests would resist. In short, Pollard's warrantless entry, and his conduct immediately preceding the same, gave rise to a foreseeable risk of a deadly encounter—a significantly greater risk than that taken by Officer Cherry in *Attocknie*.

Plaintiffs succinctly summarize the scope of risk analysis as follows:

> Officer Pollard was looking for someone who had been shooting a gun when he made his warrantless entry with his own gun drawn and ready to fire. Of course it was foreseeable someone might be shot when Pollard entered the home in violation of the Fourth Amendment—Officer Pollard had his gun drawn, ready to shoot, if

he encountered someone with a gun—which he expected. And that is exactly what happened.

(Resp. 18:1–7, ECF No. 141).

The Court agrees with Plaintiffs. A reasonable jury could conclude that the manner in which Pollard conducted the warrantless search—the predicate conduct—created a foreseeable risk of an ensuing firefight resulting in death or serious bodily injury to the homeowner. Accordingly, Defendants' Motion for Summary Judgment on Plaintiffs' Fourth Amendment claim under a theory of proximate cause is denied.

### D. State Law Claims

#### 1. Discretionary Immunity

Under Nevada's discretionary-function immunity statute, "no action may be brought" against a public officer "[b]ased upon the exercise or performance or the failure to exercise or perform a discretionary function or duty . . . whether or not the discretion involved is abused." NRS 41.032. Nevada courts expressly rely upon the Federal Tort Claims Act ("FTCA") for guidance on state discretionary immunity. *Martinez v. Maruszczak*, 168 P.3d 720, 728–29 (Nev. 2007). Borrowing from the FTCA, Nevada has adopted a two-part test to determine whether government officials are entitled to discretionary immunity. *Id.*

A decision is entitled to discretionary immunity under NRS 41.032 if the decision "(1) involve[s] an element of individual judgment or choice and (2) [is] based on considerations of social, economic, or political policy." *Martinez*, 168 P.3d at 728–29. In analyzing discretionary immunity, courts "must assess cases on their facts, keeping in mind Congress' purpose in enacting the exception: to prevent judicial second-guessing of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *Id.* at 729 (citation omitted).

Under step one of the analysis, Pollard's choice to investigate the source of the gunfire and his tactical decisions to effectuate this investigation required the kind of individual judgment NRS 41.032 was enacted to safeguard. *See Davis v. City of Las Vegas*, 478 F.3d 1048, 1059 (9th Cir. 2007) (applying Nevada law).

Pollard's conduct, viewed under Plaintiffs' version of the disputed facts, fails to satisfy step two. "[W]here an officer's actions are 'attributable to bad faith, immunity does not apply whether an act is discretionary or not.'" *Sandoval*, 756 F.3d at 1168 (quoting *Falline v. GNLV Corp.*, 823 P.2d 888, 891 (Nev. 1991)). Under this rationale, NRS 41.032 does not shield government actors from liability for intentional torts. *Franchise Tax Bd. of State of California v. Hyatt*, 407 P.3d 717, 733 (Nev. 2017). Similarly, governmental officials "do not possess discretion to violate constitutional rights." *Galvin v. Hay*, 374 F.3d 739, 758 (9th Cir. 2004); *see also Nurse v. United States*, 226 F.3d 996, 1002 n.2 (9th Cir. 2000) ("[T]he Constitution can limit the discretion of federal officials such that the FTCA's discretionary function exception will not apply.").

Given the disputed issues of fact in this case, the Court cannot say as a matter of law that Pollard's conduct evinced an absence of bad faith. Because a reasonable jury could find Pollard's violation of Plaintiffs' constitutional rights was so unreasonable as to amount to bad faith, Pollard is not entitled to discretionary immunity at this stage. *Davis*, 478 F.3d at 1060 ("Whether Officer Miller's actions were in bad faith is a determination that may not be made at summary judgment, at least not where, as here, there are contested issues of material fact with respect to Officer Miller's conduct and his motivation.").

## 2. Negligence

To state a negligence claim, a plaintiff must show: (1) the defendant owed a duty of care to the plaintiff; (2) the defendant breached that duty; (3) the breach was the legal cause of the plaintiff's injury; and (4) the plaintiff suffered damages. *Scialabba v. Brandise Constr. Co.*,

*Inc.*, 921 P.2d 928, 930 (Nev. 1996) (citation omitted). "Whether a defendant owes a plaintiff a duty of care is a question of law." *Id.* "Police officers unquestionably owe a duty of care to the general public." *Vasquez-Brenes*, 51 F. Supp. 3d 999, 1014 (D. Nev 2014), *reversed on other grounds by Vasquez-Brenes v. Las Vegas Metro. Police Dep't*, 670 Fed. App'x 617 (9th Cir. 2016).

Here, Defendants' argument on Plaintiffs' negligence claim is limited to the assertion that Plaintiffs "have not and cannot meet their burden to prove that Defendants breached any duty of care owed them in using force against Fernando Sauceda." (MSJ 28:9–10). Given the foregoing proximate cause analysis, as well as genuine issues of material fact as to the reasonableness of Pollard's predicate conduct, Defendants' limited argument here is not enough to shift the summary-judgment burden to Plaintiffs.

### 3. Negligent Infliction of Emotional Distress

"A bystander who witnesses an accident may recover for emotional distress in certain limited situations." *Grotts v. Zahner*, 989 P.2d 415, 416 (Nev. 1999). "To recover, the witness-plaintiff must prove that he or she (1) was located near the scene; (2) was emotionally injured by the contemporaneous sensory observance of the accident; and (3) was closely related to the victim." *Id.*

As with the negligence claim, Defendants contend "there is no evidence of negligence and therefore support for Plaintiffs' negligent infliction cause of action." (MSJ 27:1–6). Because Plaintiffs' negligence claim remains alive, Defendants' reliance on the linkage between negligent infliction and negligence fails to negate any element of the former. Accordingly, burden shifting is unwarranted, and the claim survives.

### 4. Intentional Infliction of Emotional Distress

To state a claim for intentional infliction of emotional distress ("IIED"), a plaintiff must show: (1) the defendant's conduct was extreme, outrageous, and committed with either the

intention of, or reckless disregard for, causing emotional distress; (2) the plaintiff suffered severe or extreme emotional distress; and (3) causation. *Olivero v. Lowe*, 995 P.2d 1023, 1025 (Nev. 2000). "Extreme and outrageous conduct is that which is outside all possible bounds of decency and is regarded as utterly intolerable in a civilized community." *Maduike v. Agency Rent-A-Car*, 953 P.2d 24, 26 (Nev. 1998). To establish severe emotional distress, the plaintiff must demonstrate that "the stress [is] so severe and of such intensity that no reasonable person could be expected to endure it." *Alam v. Reno Hilton Corp.*, 819 F. Supp. 905, 911 (D. Nev. 1993).

Defendants argue that Plaintiffs cannot establish the outrageous-conduct element because Nevada law requires an "extreme abuse of [the] position." (MSJ 26:1–5) (citing Restatement (Second) of Torts § 46, cmt. e). Defendants cite to cases from this District where the Courts held that notwithstanding a valid Fourth Amendment claim, an IIED claim may be subject to dismissal given the distinct standards governing those causes of action. (*Id.* 26:5–16) (citing *Cerros v. N. Las Vegas Police Dep't*, No. 206-CV-00647-LRH-PAL, 2007 WL 2325161 (D. Nev. Aug. 10, 2007); *Blankenship v. Cox*, No. 3:05-cv-00357-RAM, 2007 WL 844891 (D. Nev. Mar. 19, 2007)). In this case, Defendants contend Plaintiffs have "no evidence of outrageous conduct or that Defendants acted with disregard as to a high probability that their actions would cause severe emotional distress." (MSJ 26:23–26).

Defendants argument fails on two grounds. First, the authorities Defendants cite fail to convince the Court that, as a matter of law, Pollard's conduct was not outrageous. In *Cerros*, the plaintiff alleged that officers approached him in a public place and put him in handcuffs for two hours as the officers searched his personal property without a warrant. 2007 WL 2325161, at *1. In *Blankenship*, the plaintiff's IIED claim was dismissed due to technical pleading deficiencies not relevant to this case. 2007 WL 844891, at *12. The factual dissimilarities

between *Cerros* and this case, and the procedural nature of the dismissal in *Blankenship*, render these authorities inapposite.

Second, and more importantly, the genuine factual dispute as to Pollard's conduct on the night of the incident, coupled with the question of Pollard's intent, signal to the Court that this claim is not amenable to resolution at summary judgment.

### 5. Assault and Battery

To state an assault claim, a plaintiff must demonstrate that the defendant: (1) intended to cause harmful or offensive physical contact; and (2) the victim was put in apprehension of such contact. *Sandoval v. Las Vegas Metro Police Dep't*, 854 F. Supp. 2d 860, 882 (D. Nev. 2012) (citing Restatement (Second) of Torts, § 21 (1965)), *reversed on other grounds by Sandoval v. Las Vegas Metro. Police Dep't*, 756 F.3d 1154 (9th Cir. 2014). To state a battery claim, a plaintiff must demonstrate that the defendant: (1) intended to cause harmful or offensive contact; and (2) such contact occurred. *Burns v. Mayer*, 175 F. Supp. 2d 1259, 1269 (D. Nev. 2001) (citing Restatement (Second) of Torts §§ 13, 18 (1965)). In Nevada, police officers are privileged to use the amount of force reasonably necessary. *See Yada v. Simpson*, 913 P.2d 1261, 1262 (Nev. 1996), *superseded by statute on other grounds as recognized by RTTC Commc'n, LLC v. Saratoga Flier, Inc.*, 110 P.3d 24, 29 (Nev. 2005). Officers are "liable for battery to the extent they use more force than is reasonably necessary." *Gordon v. Las Vegas Metro. Police Dep't*, No. 2:13-cv-01095-GMN-GWF, 2015 WL 5344549, at *11 (D. Nev. Sept. 14, 2015); *Ramirez v. City of Reno*, 925 F. Supp. 681, 691 (D. Nev. 1996) (applying Nevada law); *see Yada*, 913 P.2d at 1262.

Defendants argue that Plaintiffs' assault and battery claims cannot survive summary judgment because "the Court already held that Officer Pollard's use of deadly force was reasonable." (MSJ 27:24–27). Defendants continue, "[i]n these circumstances there was no

"unlawful" touching of Sauceda and Plaintiffs cannot prove the elements of their claim for assault and battery." (*Id.* 27:25–27). The Court agrees.

Because Judge Gordon already concluded that Pollard's use of force was objectively reasonable under *Graham*, (*see* Order 6:11–8:6, ECF No. 107), and given the absence of any dispute as to the correctness of that holding, Plaintiffs' claims for assault and battery cannot survive. *See J.D.H. v. Las Vegas Metro. Police Dep't*, No. 2:13-cv-01300-APG-NJK, 2014 WL 3809131, at *7 (D. Nev Aug. 1, 2014) ("Like an excessive force claim, battery and assault claims against police officers also require proof of unreasonable force."); *see also Ramirez*, 925 F. Supp. at 691 ("The standard for common-law assault and battery by a police officer thus mirrors the federal civil rights law standard . . . ."). Therefore, Defendants are entitled to summary judgment on Plaintiffs' assault and battery claims.

///
///
///
///
///
///
///
///
///
///
///
///
///
///

## IV.   CONCLUSION

**IT IS HEREBY ORDERED** that Defendants' Renewed Motion for Summary Judgment, (ECF No. 140), is **GRANTED in part** and **DENIED in part**.

**IT IS FURTHER ORDERED** that Defendants' Motion, as to Plaintiffs' state law claims for assault and battery is **GRANTED**.  Defendants' Motion with respect to Plaintiffs' Fourth Amendment claim under a theory of proximate causation, as well as the state law claims for negligence, negligent infliction of emotional distress, and intentional infliction of emotional distress is **DENIED**.

**IT IS FURTHER ORDERED** that Judge Gordon's partial grant of summary judgment, (ECF No. 107), remains operative as to Plaintiffs' claims that are not impacted by *Mendez*. Thus, the Court **GRANTS** Defendants summary judgment on Plaintiffs' claims for section 1983 municipal liability and negligent supervision and training.

**IT IS FURTHER ORDERED** that the parties shall have thirty (30) days from the date of this Order's issuance to file a joint pretrial order.

**DATED** this __30__ day of March, 2019.

_____
Gloria M. Navarro, ~~Chief~~ Judge
United States District Judge