**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| ESTATE OF FERNANDO SAUCEDA, et al., | Case No.: 2:11-cv-02116-GMN-NJK |
| Plaintiff(s), | |
| v. | **REPORT AND RECOMMENDATION** |
| CITY OF NORTH LAS VEGAS, et al., | [Docket No. 174] |
| Defendant(s). | |

Pending before the Court is Plaintiffs' renewed petition for compromise of minor's claim. Docket No. 174. Defendants filed a notice of non-opposition. Docket No. 176. As ordered by the Court, the parties also filed a supplemental brief. Docket No. 180. The matter is properly resolved without a hearing. *See* Local Rule 78-1. For the reasons discussed below, the undersigned **RECOMMENDS** that the petition be **GRANTED**.

I.    **BACKGROUND**[1]

This case arises from an officer-involved shooting at the home of Plaintiffs in North Las Vegas soon after midnight on January 1, 2011. On the night of the incident, Plaintiffs and several other individuals were at Plaintiffs' home celebrating New Year's Eve. Special Operations Officers Jeffrey Pollard and Michael Harris were tasked that evening with patrolling the

---

[1] This background section has been derived from the order by United States District Judge Gloria M. Navarro resolving summary judgment motion practice, with citations to the record omitted herein. Docket No. 157 at 1-3.

neighborhood near Plaintiff's home and particularly, to be on the lookout for celebratory gunfire, a common occurrence in North Las Vegas on New Year's Eve. The officers were patrolling in Harris's unmarked pickup truck with Pollard in the passenger seat. The officers were wearing the North Las Vegas Police Department ("NLVDP") special operations uniform, consisting of an olive green, fatigue-style shirt with subdued-colored NLVPD insignia patches on each arm, and a duty belt.

At approximately midnight, the officers drove past Plaintiffs' house when Pollard saw a group of people standing in front of the home with the lights on. Pollard testified he did not see anything suggesting illegal activity. Pollard and Harris continued down the street, circled the block, and from an adjacent street, three houses away, Pollard glanced at Plaintiffs' home and observed "somebody holding something shiny up in the air that looked like maybe the barrel of a rifle." At this point, the officers did not hear any gunshots.

After Pollard described to Harris what he saw, the officers parked the truck a few properties away from Plaintiffs' house. The officers notified dispatch and waited outside the truck for thirty seconds to a minute to devise a plan. Standing outside the truck, Pollard and Harris heard the sounds of gunshots in the distance, and subsequently notified dispatch, obtaining a "code red," by which a police radio channel is cleared. According to Pollard, the officers "weren't sure that [Plaintiffs' home was] where the gunfire came from. We weren't sure. We only heard shots in the air. We were hearing numerous shots coming from different aspects of the city."

After devising their plan to make their approach, the officers exited the truck several houses down from Plaintiffs' residence, unholstered their guns, and walked toward Plaintiffs' home at normal pace without activating their handgun-mounted flashlights or announcing their presence. The officers heard no further gunshots once they commenced their approach.

As the officers arrived within two houses of Plaintiffs, an unidentified individual standing in Plaintiffs' driveway noticed Pollard and Harris and asked who they were. The officers activated their flashlights and rushed onto the property. The officers claim that they announced themselves as police, but the other witnesses testified that the officers did not identify themselves and that in their camouflage uniforms, they did not recognize the officers as law enforcement.

While Harris approached several individuals standing in the driveway, Pollard pursued other individuals who had run toward the residence. The residence included a porch that is enclosed with a tarp, except for an opening that allowed for ingress and egress through the front door. Chasing the runners, Pollard ran up to the porch and pulled back the tarp, looking in. Pollard noticed movement to his left and turned to find Fernando Sauceda ("Sauceda") pointing a gun at his face. Officer Pollard held down Sauceda's right arm and, after a struggle, fired twelve shots at Sauceda as he attempted to flee. Officer Pollard's shots hit Sauceda nine times—five in the front and four in the back—and he died shortly thereafter.

The instant lawsuit was then brought by Sauceda's spouse and three children, two of whom are minors. Plaintiffs bring claims under 42 U.S.C. § 1983, as well as claims under state law. The parties reached a settlement during mediation at the Ninth Circuit and are currently before the Court seeking approval of the settlement amounts with respect to the minor Plaintiffs.

## II.     MAGISTRATE JUDGE AUTHORITY

Before turning to the substance of the pending petition, the undersigned first evaluates its authority to address the matter. The authority of the undersigned magistrate judge is derived from 28 U.S.C. § 636, which generally provides magistrate judges with the authority to "hear and determine" non-dispositive matters. *See* 28 U.S.C. § 636(b)(1)(A); *see also S.E.C. v. CMKM Diamonds, Inc.*, 729 F.3d 1248, 1259 (9th Cir. 2013).[2] By contrast, dispositive matters are sometimes referred to magistrate judges, but in those circumstances a magistrate judge submits a recommendation to the assigned district judge that is subject to the district judge's *de novo* review. *See* 28 U.S.C. § 636(b)(1)(B); *see also CMKM Diamonds*, 729 F.3d at 1259-60. Section 636 specifically enumerates eight different types of matters to be treated as "dispositive." *See* 28 U.S.C. § 636(b)(1)(A)-(B). When a matter falls outside of those expressly enumerated as dispositive, courts look to the nature and effect of the issued ruling to determine whether the

---

[2] Plaintiffs' counsel refer repeatedly to the undersigned's colleagues as "Magistrate Foley," "Magistrate Cobb," "Magistrate Boone," and, even worse, "Mag. Leen." *See, e.g.*, Renewed Pet. at 6, 9, 10, 14; Suppl. at 2. There are no "magistrates" in the federal system and there have not been any for nearly three decades. *E.g.*, *Dixon v. Ylst*, 990 F.2d 478, 480 n.1 (9th Cir. 1993). "The title was changed from 'magistrate' to 'magistrate judge'" in 1990. *Id.* "[A] magistrate judge may be appropriately called magistrate judge or judge, but not magistrate." *Williams v. City of Mesa*, Case No. CV-09-1511-PHX-LOA, 2010 WL 2803880, at *2 n.1 (D. Ariz. July 15, 2010).

underlying matter should be considered dispositive or non-dispositive. *See, e.g.*, *Flam v. Flam*, 788 F.3d 1043, 1046 (9th Cir. 2015).

There is a split of case law on whether a petition for a minor's compromise is dispositive for purposes of a magistrate judge's authority. Some courts have suggested that such a decision is non-dispositive in nature. *See, e.g.*, *Rutgard v. Haynes*, 61 F. Supp. 2d 1082, 1085 n.5 (S.D. Cal. 1999). Other courts have come to the opposite conclusion, deciding that such petitions are of a dispositive nature and, consequently, are beyond a magistrate judge's authority to decide. *See, e.g.*, *J.H. v. Siroky*, Case No. 2:17-cv-02151-JAD-GWF, 2019 WL 2251772, at *2 (D. Nev. May 8, 2019), *adopted*, 2019 WL 2250267 (D. Nev. May 23, 2019). The undersigned agrees with this latter line of cases that resolving a petition for minor's compromise is a dispositive matter that effectively disposes of the minor's claims against the defendants. *See Credle v. Samsung SID Am., Inc.*, Case No. 17-cv-07281 NC, 2019 WL 8331469, at *3 (N.D. Cal. Apr. 8, 2019). Moreover, proceeding with resolving the petition would unnecessarily subject that decision to potential nullification as jurisdictionally deficient. *See id.* The better approach is to err on the side of caution. *Cf. Selective Ins. Co. of S.C. v. Sela*, 353 F. Supp. 847, 852-53 (D. Minn. 2018).

Accordingly, a report and recommendation to the assigned district judge will issue.

## III.    STANDARDS AND ANALYSIS

"District courts have a special duty, derived from Federal Rule of Civil Procedure 17(c), to safeguard the interests of litigants who are minors." *Robidoux v. Rosengren*, 638 F.3d 1177, 1181 (9th Cir. 2011). District courts may not permit the settlement of minors' claims without conducting their "own inquiry to determine whether the settlement serves the best interests of the minor." *Dacanay v. Mendoza*, 573 F.2d 1075, 1080 (9th Cir. 1978). To satisfy this duty, the district court "must independently investigate and evaluate any compromise or settlement of a minor's claims to assure itself that the minor's interests are protected, even if the settlement has been recommended or negotiated by the minor's parent or guardian ad litem." *Salmeron v. United States*, 724 F.2d 1357, 1363 (9th Cir. 1983). The inquiry is limited in scope to reviewing "whether the net amount distributed to each minor plaintiff in the settlement is fair and reasonable, in light of the facts of the case, the minor's specific claim, and recovery in similar cases." *Robidoux*, 638

1  F.3d at 1181-82.  This inquiry focuses on the net amount distributed to the minor without regard

2  to the amount of attorneys' fees included.  *Id.* at 1179.[3]

3       In this case, the settlement amount for each minor Plaintiff is $98,750, with a net amount

4  of $56,647 distributed to each minor Plaintiff.  *See, e.g.*, Renewed Pet. at 18.  The net distribution

5  amount is fair, reasonable, and in the minor Plaintiffs' best interests.  As discussed at length above,

6  the facts of the case involve the loss of life and the serious impact of those incidents on the minor

7  Plaintiffs.  At the same time, the settlement amount is generous, if anything, for the minors'

8  specific claims given the steep odds of succeeding in establishing liability and in obtaining an

9  award in this ballpark.  As the petition itself acknowledges, Plaintiffs face several significant

10 hurdles to win on the merits, not the least of which are (1) the undisputed fact that Saucedo was

11 pointing his gun directly at a police officer's head when he was himself shot and (2) the need to

12 convince a unanimous jury that the officer is lying about the events leading up to that moment.

13 *See id.* at 13-14.

14      Lastly, the minor Plaintiffs' settlement amount in this case is comparable to—or more

15 generous than—recoveries in similar cases.  For example, *Doe ex rel. Scott v. Gill* involved a

16 minor's claims arising out of her mother's shooting by police while she was under the influence

17 of a controlled substance and attempting to hit an officer with a stolen vehicle.  Case No. C 11-

18 4759 CW, 2012 WL 1939612, at *2 (N.D. Cal. May 29, 2012).  The district court in that case

19 found a settlement with a net distribution to the minor of $7,189 to be reasonable.  *See id.*  As

20 another example, *Napier v. San Diego County* involved a minor's claims arising out of his father's

21 shooting death during an attempted arrest.  Case No. 3:15-cv-00581-CAB-(KSC), 2017 WL

22 5759803, at *1 (S.D. Cal. Nov. 28, 2017).[4]  The district court in that case found a settlement with

23

24     [3] The Ninth Circuit has made clear that its standards apply in federal question cases.
   *Robidoux*, 638 F.3d at 1179 n.2.  Moreover, district courts within the Ninth Circuit have concluded

25 that federal law applies to the entirety of a request to approve a minor's settlement in cases in
   which the district court exercises federal question jurisdiction and supplemental jurisdiction over

26 additional state law claims.  *See, e.g.*, *A.G.A. v. County of Riverside*, Case No. EDCV 19-00077-
   VAP (SPx), 2019 WL 2871160, at *2 n.1 (C.D. Cal. Apr. 26, 2019) (collecting cases).  The Court

27 similarly here applies the *Robidoux* standard to the entirety of the settlement.

28     [4] The facts underlying the claims in *Napier* were summarized as follows:

a net distribution to the minor of $41,125 to be reasonable.  *Id.* at \*2-3.  Other cases have found even lower settlement amounts to be reasonable.  *See, e.g.*, *Swayzer v. City of San Jose*, Case No. C10-03119 HRL, 2011 WL 3471217, at \*1 (N.D. Cal. Aug. 5, 2011) (approving net total of $2,054 to minor for wrongful death claim arising out of arrest).  Especially given the significant hurdles Plaintiffs would face in prevailing on the merits in this case, these decisions show that the settlement of the minor Plaintiffs' claims here are fair and reasonable.

In short, a net amount distributed to each minor Plaintiff of $56,647 is fair and reasonable in light of the facts of the case, the minor's specific claim, and recovery in similar cases.

## IV.    CONCLUSION

For the reasons discussed above, the undersigned **RECOMMENDS** that the renewed petition for minors' compromise be **GRANTED** and that the above funds be ordered to be deposited into a blocked trust account with proof of such deposit provided to the Court within 60 days of the order resolving the motion.

Dated: April 15, 2020

_____
Nancy J. Koppe
United States Magistrate Judge

## **NOTICE**

This report and recommendation is submitted to the United States District Judge assigned to this case pursuant to 28 U.S.C. § 636(b)(1).  A party who objects to this report and recommendation must file a written objection supported by points and authorities within fourteen

---

On January 31, 2014, a handful of San Diego County Sheriff's deputies in the Gang Enforcement Team went to a Vista apartment complex in order to arrest Michael Napier.  Upon arriving at the location, the deputies found Napier in the garage of his father's house working on his bicycle.  The deputies proceeded to approach the garage with their guns drawn, enter the structure, identify themselves as officers and ordered Napier to put his hands up.  Two of the deputies, Boisserance and Danza, fired their weapons at Napier, striking him several times.  Napier died at the scene.

2017 WL 5759803, at \*1 (internal citations omitted).

days of being served with this report and recommendation.  Local Rule IB 3-2(a).  Failure to file a timely objection may waive the right to appeal the district court's order.  *Martinez v. Ylst*, 951 F.2d 1153, 1157 (9th Cir. 1991).